# United States Court of Appeals
## For the First Circuit

Nos. 00-1545
     00-1546
     00-1575
     00-1577
     00-1700

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS RIVERA-ROSARIO, A/K/A NEGRI,
CARLOS COLLAZO-ARROYO, A/K/A CARLI,
FEDERICO NARANJO-ROSA, A/K/A PAPO,
JESÚS TORO-SANTIAGO, A/K/A CHU,
ORLANDO HERNÁNDEZ,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Joseph Waldbaum, for appellant Rivera-Rosario.
Raymond Rivera-Esteves, for appellant Collazo-Arroyo.
Linda Backiel, for appellant Naranjo-Rosa.
Randy Olen, with whom Bevilacqua and Cicilline, was on brief
for appellant Toro-Santiago.
Jane Elizabeth Lee, for appellant Hernández.
Mark Irish, Assistant United States Attorney, with whom

Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Assistant United States Attorney, Chief, Criminal Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief for appellee.

---

August 7, 2002

---

**TORRUELLA**, **Circuit Judge**.  The facts of this appeal are so unique that they could originate only in the District of Puerto Rico, the sole district within the American federal judiciary where every judge and almost every juror is fluent in English and Spanish.

Defendants-appellants were convicted of conspiracy to possess with intent to distribute marijuana, cocaine, and heroin. On appeal, defendants collectively and separately raise a host of challenges to their convictions and sentences.  After reviewing the issues presented, we find that the district court erred in allowing evidence to be presented to the jury in Spanish without an English translation.  Because we conclude that this error undermined the right to meaningful appellate review for some of the defendants, we reverse, in part, affirm, in part, and remand the case for action consistent with this opinion.

## FACTUAL BACKGROUND

Acting upon a wiretap order, Federal Bureau of Investigation ("FBI") agents intercepted and recorded numerous telephone conversations among the defendants.  The conversations were in Spanish and contained references to tires, car jacks, spurs, tennis shoes, windows, cakes, and ceramic dogs.  Believing that these terms were coded references to drugs, the government sought to indict defendants Luis Rivera-Rosario, Carlos Collazo-Arroyo, Orlando Hernández, Jesús Toro-Santiago, and Federico Naranjo-Rosa.  On December 10, 1997, a federal grand jury indicted the defendants on charges of conspiring to possess with intent to

distribute multi-kilogram quantities of drugs, in violation of 21 U.S.C. § 846.

At trial, the prosecution's evidence against the defendants consisted primarily, though not exclusively, of 180 audiotapes, which contain the intercepted conversations. Before introducing these recordings in evidence, the government provided the district court and defense counsel with a Spanish transcript of the tapes and an English translation of the Spanish transcript. The court then asked the jury whether it preferred to listen to the tapes while reading the Spanish transcript or the English translation. The jury responded that it wanted to review the English translation. At that moment, the prosecution informed the court that there were not enough English translations for all of the jurors. In light of this shortage, the court instructed the government to give each juror a Spanish transcript and to distribute a couple of copies of the English translation to the jury as a whole.

Before this instruction could be implemented, however, defense counsel objected on the ground that the English translation contained so many inaccuracies that the jury should not be allowed to see it.[1] After ascertaining that all of the jurors spoke fluent Spanish, the court ruled that only the Spanish transcript would be made available to the jury; the English translation was thus cast aside.

---

[1] Defense counsel were provided the English translation of the Spanish transcript for the first time at trial and, as a result, did not have an opportunity to object beforehand.

For the next four days of trial, the jury heard the Spanish tapes and read the Spanish transcript. As the tapes played in open court, the court interpreter did not translate any of the recordings. Neither the Spanish transcript nor the English translation was marked as an exhibit or made part of the record.

In addition to the tapes, the government relied on the testimony of four witnesses to meet its burden of proof. FBI Special Agent Carlos Cases testified about the defendants' use of coded references to drugs in their taped conversations. Next, cooperating witnesses Daniel Sánchez-Ortiz and Alberto Negrón-Constantino testified that they purchased drugs from Toro-Santiago in 1995. Finally, FBI Special Agent Harold Clouse stated that notebooks seized from Toro-Santiago's residence may contain references to drug activity.

The government also introduced several pieces of physical evidence inculpating the defendants, including: (1) drug paraphernalia, such as sifters and an electronic scale, seized from Rivera-Rosario's bedroom; (2) approximately $8,000 in cash found in Toro-Santiago's house; and (3) notebooks from Toro-Santiago's residence with notations that allegedly related to illegal drug activity.[2]

On October 26, 1999, the jury convicted the defendants of conspiracy to possess with intent to distribute illegal narcotics.

---

[2]   In addition, the government introduced a 9-millimeter pistol seized at the time of Rivera-Rosario's arrest and telephone records demonstrating that Toro-Santiago made several phone calls to the Dominican Republic and Venezuela.

Seeking to reverse their convictions and sentences, the defendants filed the instant appeal.

**DISCUSSION**

**I.**

It is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English. Even if this practice were not intuitively obvious in Puerto Rico, Congress enacted section 42 of the Jones Act, which requires that "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico . . . be conducted in the English language." 48 U.S.C. § 864 ("Jones Act" or "English language requirement") (emphasis added); see also United States v. De Jesús Boria, 518 F.2d 368, 370-71 (1st Cir. 1975) (upholding the constitutionality of the English language requirement). This requirement is significant not only because it guarantees that the District of Puerto Rico remains "a viable part of the federal judicial system," United States v. Valentine, 288 F. Supp. 957, 964 (D.P.R. 1968), but also because it allows this Court to review evidence in the same language in which it was presented to the district court.

The parties do not dispute that a violation of the Jones Act occurred. Indeed, it would be impossible to contest the issue: 180 tapes were played in Spanish throughout four days of trial without a single translation. Though we understand, and sympathize with, the district court's desire not to delay the trial by waiting for the parties to agree on an acceptable translation, the court's

-6-

ruling ran afoul of the English language requirement. We thus direct our attention to the more contentious and perplexing issue of how and when to remedy a violation of the English language requirement. This issue does not simply involve the correction of a technical violation; rather, it implicates the more troubling question of how to conduct meaningful appellate review when substantial portions of the record are in a foreign language.

In analyzing this matter, we are left without a guiding star by which to steer our course. The statute does not provide a remedy for violations of its mandate; the legislative history furnishes no guidance on what remedial framework should be employed; and the issue is unprecedented in caselaw. Sensing our predicament, the parties offer several competing frameworks to address the present violation.

The government argues that we should rely on the analytical framework of the plain error doctrine to dispose of defendants' claim because defendants failed to raise it in district court.[3] Ordinarily, before an appellate court can correct an error not raised at trial, the defendant must demonstrate that: (1) there was error; (2) the error was plain; (3) the error affected the defendant's substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of the judicial proceeding. See United States v. Olano, 507 U.S. 725, 732-36 (1993). Since the defendants failed to raise their Jones

---

[3]    Though defendants objected to the inaccuracies in the government's English translation, it is undisputed that they failed to raise their Jones Act claim before the district court.

-7-

Act claim below, the government concludes that the defendants must now satisfy the rigors of plain error review to obtain a reversal of their convictions on this issue.

Though we applaud the conscientious attorney who objects to the presentation of foreign language evidence without translation, we find that it is the independent duty of the district court to make sure that "[a]ll pleadings and proceedings . . . be conducted in the English language." 48 U.S.C. § 864.[4] As such, we relieve the parties of their usual duty to contemporaneously object.

We impose this independent duty on the district court for three important reasons. First, the Court Reporter Act, 28 U.S.C. § 753(b), places a similar independent duty on the judiciary. The Court Reporter Act requires that a reporter "record verbatim or by mechanical means . . . all proceedings in criminal cases held in open court." Id. All of the circuit courts that have examined the Court Reporter Act have held that it is the responsibility of the court, not the parties, to enforce the statute. See United States v. Nolan, 910 F.2d 1553, 1560 (7th Cir. 1990) ("The duty to comply with § 753(b) lies with the court, not the parties."); United States v. Gallo, 763 F.2d 1504, 1530 (6th Cir. 1985) (ruling that "it is the duty of the court, not the attorneys, to meet the Act's

---

[4] Nothing in this opinion, however, should be construed to disturb the well-settled rule that parties are required to translate all foreign language documents into English. See Local Rule 108.1 of the District Court for the District of Puerto Rico. Once the parties translate the documents into English and offer them as evidence, it is the court's duty to ensure that all evidence is presented in English to the jury and for the record.

-8-

requirements" (emphasis in original)); United States v. Upshaw, 448 F.2d 1218, 1224 n.6 (5th Cir. 1971) (same); Edwards v. United States, 374 F.2d 24, 26 n.2 (10th Cir. 1967) (same).  Thus, a party on appeal is not subjected to plain error review for failing to object below to a violation of the Court Reporter Act.  See United States v. Brand, 80 F.3d 560, 563 (1st Cir. 1996) (holding that in order to obtain reversal for a violation of the Court Reporter Act, appellant must show "specific prejudice to his ability to perfect an appeal," not plain error, even where there was no objection below).

Like the Court Reporter Act, the English language provision of the Jones Act requires that evidence be memorialized in a particular manner.  And just as there is a court reporter to satisfy the requirements of the Court Reporter Act, there are several court personnel assigned to the task of ensuring that the record is maintained in English.  Court interpreters are responsible for translating all foreign language testimony into English.  See Court Interpreters Act, 28 U.S.C. §§ 1827-1828.[5]

---

[5]    The Court Interpreters Act requires courts to appoint interpreters:

> if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony in such judicial proceedings . . . speaks only or primarily a language other than the English language . . . so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer.

28 U.S.C. § 1827(d)(1).

They are also required to certify that all documents submitted to the district court have been properly translated into English. See Local Rule 108.1 of the District Court for the District of Puerto Rico. Finally, the clerk of the court is obligated to "refuse to receive and file the record" of any case removed to district court that does not contain "an English translation of all papers." Id. Specific court personnel, then, are responsible for transcribing court proceedings, in the case of the Court Reporter Act, and for ensuring an English language record, in the case of the Jones Act. We therefore refuse to penalize parties, by subjecting them to a more rigorous standard of appellate review, for failing to request what court employees are required by statute to provide.[6] Cf. Upshaw, 448 F.2d at 1224 n.6 ("The mandate of the [Court Reporter] Act may not be shifted to counsel.").

Second, the English language requirement in 48 U.S.C. § 864 appears under a subchapter entitled "The Judiciary." All of the provisions within this subchapter place administrative burdens on the District of Puerto Rico, ranging from the requirement that courts deposit collected fees to the credit of the United States, 48 U.S.C. § 868, to the demand that all judicial officials be citizens of the United States, 48 U.S.C. § 874. Thus, Congress'

---

[6] Where, as here, the district court was put on notice of the foreign language content of the tapes and refused to allow the jury to review any English language transcript of those tapes, the court had no other option than to appoint a court interpreter to provide contemporaneous English translations for the jury and for the record. Cf. United States v. Arthurs, 73 F.3d 444, 447 (1st Cir. 1996) (noting that when the court is on notice of language difficulties, the court has a duty to inquire into the matter and, if necessary, to provide an interpreter).

placement of the English language requirement alongside these statutorily-mandated court responsibilities evinces an intent to place an independent duty on courts to ensure that all evidence is presented in English.

Finally, given how obvious Jones Act violations are, there is no need for contemporaneous party objections. In the instant case, for example, the court knew that foreign language evidence was being presented without translation: approximately 180 Spanish tapes were played in open court throughout four days of trial without translation. Moreover, the district court specifically approved of this course of action:

> During the Hernández case, the Supreme Court says that the jury must -- all of the jury must listen to the English version [of the evidence], not the Spanish version. That [case] was in New York . . . . where some jurors did not speak Spanish, and therefore, the Supreme Court has ruled that every juror must listen to the same evidence. Since all the jurors speak Spanish [in this case], then I think we are safe.[7]

The court was thus on notice of the problem, had a duty to remedy it, and had the personnel necessary to implement the required solution. In fact, the court recognized this duty, only too late, when it called upon court interpreters to provide English

---

[7] The district court was referring to Hernández v. New York, 500 U.S. 352 (1991), in which the Supreme Court held that a prosecutor did not violate the Equal Protection Clause when he used his peremptory strikes to remove two Spanish-speaking potential jurors for fear that they would not defer to the official translation of the anticipated Spanish language testimony.

translations of a few Spanish words for the jury.[8]  In sum, we do not think a contemporaneous objection is needed to remind the district court that it is an English language court.[9]  We therefore decline the government's invitation to employ plain error review.

In the alternative, the government argues that the violation of the English language requirement can be remedied by simply supplementing the record on appeal to include a certified English translation of the Spanish tapes.  See Fed. R. App. P. 10(e) (authorizing appellate courts to supplement the record to correct omissions or misstatements).  Though tantalizingly efficient, this proposal is beset with procedural and substantive difficulties that ultimately make it unappealing.

---

[8]  Had the district court adopted this practice with all of the Spanish language evidence, there would be no disputed English translation on appeal.

[9]  Though defense counsel acquiesced to the district court's decision to discard the English language translation, and may have even encouraged it, this fact is inconsequential.  The district court has an independent duty to faithfully uphold the English language requirement.  This responsibility is too important to be discharged whenever a party requests that the proceedings be conducted in a language other than English.
    Though a party may forfeit an objection to the district court's failure to follow the Court Reporter Act by acquiescing to the court's procedure, see United States v. Ellzey, 874 F.2d 324, 330 (6th Cir. 1989), we cannot extend such a procedure to cases involving the English language requirement.  The policy interest in keeping the District of Puerto Rico as an integrated part of the federal judiciary is too great to allow parties to convert that court into a Spanish language court at their whim.  Furthermore, were we to adopt such a practice, attorneys who are more comfortable speaking in Spanish would routinely encourage courts to violate the English language requirement, knowing that the record would simply be translated on appeal.  Thus, unlike the rare and inadvertent acquiescence to a court's violation of the Court Reporter Act, party acquiescence to violations of the English language requirement would effectively obliterate the requirements of the Jones Act.

First, the circumstances surrounding the government's request to supplement the record do not even fall within the purview of Rule 10(e). In Belber v. Lipson, 905 F.2d 549, 551 n.1 (1st Cir. 1990), we refused the appellant's request to expand the record on appeal to include a deposition transcript. In so ruling, we noted that "[a] 10(e) motion is designed to only supplement the record on appeal so that it accurately reflects what occurred before the district court. It is not a procedure for putting additional evidence, no matter how relevant, before the court of appeals that was not before the district court." Id.

Like the appellant in Belber, the government is seeking to expand the record impermissibly. The trial judge never reviewed the English translation that the government now seeks to introduce; the jury neither heard nor read it; and the translation was never marked as an exhibit or filed in district court. Furthermore, defendants challenge the government's translation, which they claim is one-sided and inaccurate. Under these circumstances, we cannot conclude that the government is simply attempting to "supplement the record on appeal so that it accurately reflects what occurred before the district court." We therefore reject the government's efforts to expand the record to include the English translation.[10]

---

[10] By contrast, in United States v. Andiarena, 823 F.2d 673, 676-77 (1st Cir. 1987), we affirmed a district court's decision to expand the record on appeal to include a transcript of a tape since the tape had been played at trial. Because the jury heard the tape, and since the supplemented transcript was merely a written version of what the jury heard, we found that the district court "correctly" granted the motion to expand the record. Id.
The facts in Andiarena are conspicuously different from those of the instant appeal because the English language transcript that

-13-

Second, even if we were authorized to expand the record to include an English translation on appeal, the particular facts of this appeal make doing so a perilous task.  The parties disagree on how to translate certain phrases, and it is not our prerogative to resolve such disputes.  See, e.g., United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986) (affirming the jury's authority to determine which of two competing translations is correct); Cruz, 765 F.2d at 1023 n.4 (stating that interpretation of a foreign language translation presents a jury question).  Translating the evidence now would also put us at risk of assessing evidence in a manner different from or inconsistent with the jury's interpretation.  Cf. Bordas & Co. v. Pizarro-Serrano, 314 F.2d 291 (1st Cir. 1963) (noting that "what the interpreter states in the record . . . must control both the trial and the appeal").

Finally, the government's proposal to remedy violations of the English language requirement by simply translating the Spanish tapes on appeal is too dismissive of the Jones Act.  Adopting the government's proposal would convert the English language requirement into an English language preference; it would conceivably enable district courts to conduct entire trials in Spanish, only to have the record translated on appeal.  We decline the invitation to adopt a policy that may lead to such unorthodox practices.

---

the government is seeking to introduce now is not merely a written version of what the jury heard.  Rather, the transcript was created by the prosecution and is allegedly one-sided and inaccurate; it is thus a disputed translation of what the jury heard.

Having determined that the Spanish language evidence cannot be translated on appeal, we are left with only the English language evidence to review. Thus, when a district court violates the English language requirement and allows non-English language evidence to be admitted without translation, both parties are prejudiced by the fact that the appellate court cannot review the non-English language evidence. There may be times when this prejudice is inconsequential -- for example, when the untranslated evidence is cumulative or when the untranslated evidence is not implicated by the issues on appeal. However, an appellant's right to meaningful appellate review will be undermined by a violation of the English language requirement whenever the untranslated evidence has the potential to affect the disposition of an issue on appeal.

Our analysis of the harms that result from a violation of the Jones Act has led us to discover the sought-after remedy: violations of the English language requirement will constitute reversible error whenever the appellant can demonstrate that the untranslated evidence has the potential to affect the disposition of an issue raised on appeal. Absent that potential, there is no prejudice from the violation of the Jones Act that warrants relief.

**II.**

To apply this newly-minted remedial framework, we engage in a tripartite analysis: (1) we identify the issues raised on appeal that implicate the untranslated evidence; (2) we determine whether there is sufficient evidence in the English language record to affirm the lower court's adjudication of these issues; and (3)

-15-

if there is sufficient English language evidence to affirm, we determine whether the untranslated evidence has the potential to affect that conclusion.  Applying this framework to the instant case, we find that the right to meaningful appellate review has been undermined for some, but not all, of the defendants.[11]

## A.  Hernández's Sufficiency Claim

Appellant Hernández argues that there is insufficient evidence in the record to sustain his conviction. "To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy."  United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990).  More specifically, to establish that a defendant participated in the conspiracy, the government is required to

---

[11]  Only two of the five appellants raised this issue on appeal. Because violations of the English language requirement are so severe in that they have the potential to eviscerate a party's right to meaningful appellate review, and considering that the district court has an independent duty to ensure that court proceedings are conducted in English, we review this claim, sua sponte, as it pertains to all of the appellants. See, e.g., United States v. Atkinson, 297 U.S. 157, 160 (1936) ("In exceptional cases, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise affect the fairness, integrity or public reputation of judicial proceedings."); see also Molecular Tech. Corp. v. Valentine, 925 F.2d 910, 920-21 (6th Cir. 1991) ("This court may, in its discretion, consider clear errors in the proceedings below in an unusual case sua sponte regardless of the inattentiveness of the court or the parties.").
Not only is the error here an obvious one, but it also threatens to undermine the "fairness, integrity or public reputation of judicial proceedings" by having this Court affirm appellants' convictions without being able to review all of the evidence that was presented in the district court.

demonstrate two kinds of intent: "intent to agree and intent to commit the substantive offense." United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989).

Hernández claims that the government failed to meet its burden of proof at trial. Though he admits to associating himself with the conspirators, Hernández insists that he did not intend to commit the underlying drug offense. See, e.g., Gómez-Pabón, 911 F.2d at 853 (stating that mere association with conspirators does not establish an intent to participate in the conspiracy).

In analyzing Hernández's claim, "[o]ur review of the evidence must be made in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." United States v. Angiulo, 897 F.2d 1169, 1197 (1st Cir. 1990). After examining the English language evidence in the light most favorable to the verdict, we find that there is sufficient evidence in the English language record to support Hernández's conviction.

At trial, Agent Cases testified that on several occasions Hernández was actively involved in the sale or purchase of illegal narcotics. In particular, Agent Cases testified to at least three incriminating telephone calls that involved Hernández: (1) on May 12, 1997, Hernández and another co-conspirator had a telephone conversation in which Hernández was instructed in code to purchase drugs; (2) three days later, co-defendant Rivera-Rosario told Hernández, in coded language, which sale price to assign to a specific quantity of drugs; and (3) on May 19, 1997, Hernández

-17-

contacted a co-conspirator and informed him in coded terms that they were in the process of receiving a load of drugs.

Viewed in the light most favorable to the verdict, the testimony of Agent Cases demonstrates Hernández's active participation in the conspiracy. Hernández was familiar with the coded references to drugs and prices, helped to assign prices to the narcotics, and purchased drugs for the conspiracy. Taken together, the evidence establishes that the appellant was a trusted confidante who was familiar with the inner workings of the conspiracy and advanced its illegal purpose. His claim to have merely associated with the conspirators is thus undermined by the English language evidence.

On its face, it may seem odd that the limited prosecution evidence we have been able to review could be sufficient to support Hernández's conviction, but that additional evidence from the prosecution, if we could review it, might undermine our confidence in that conclusion. However, we are routinely required to review the entire record of the proceedings below before deciding whether the evidence is sufficient to support a conviction; we do not simply read the record until we have identified sufficient evidence and then stop reading at that point. Moreover, this would not be the first time that the government had undermined its own position with the presentation of additional evidence that cast doubt on what would otherwise be a sustainable case on sufficiency of the evidence review.

The appellant makes three arguments which, viewed in the aggregate, convince this Court that the untranslated evidence has the potential to affect our conclusion that there is sufficient evidence to support the appellant's conviction. First, the quantity of untranslated evidence in this case is overwhelming: 180 tapes, totaling more than 2,000 pages of transcripts, are exclusively in Spanish. Second, the Spanish tapes are, as the government concedes, the "gravamen" of its case; they are crucial to determining the nature and extent of the charged conspiracy. Third, Hernández argues that the Spanish tapes, at most, reveal that he knew of the illegal drug scheme and that he socialized with the conspirators, which is insufficient to support his conviction. See United States v. Hyson, 721 F.2d 856, 862 (1st Cir. 1983) (ruling that associating with three conspirators and being aware of the presence of drugs in their apartment is insufficient to establish a willingness to participate in and advance the purpose of the conspiracy).

Hernández's claim of innocence presents a challenging issue to this Court, as it requires that we determine whether his conduct constitutes mere presence or culpable presence. In United States v. Ortiz, 966 F.2d 707 (1st Cir. 1992), we explained the inherent complexity of such claims:

> On the one hand, mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting. On the other hand, there are circumstances where presence itself implies participation --

-19-

> as where a 250-pound bruiser stands silently by during an extortion attempt, or a companion stands by during a robbery, ready to sound a warning or give other aid if required. In sum, the line that separates mere presence from culpable presence is a thin one, often difficult to plot.

Id. at 711-712 (internal citations and quotations omitted).[12]

The evidence necessary to resolve this issue as it relates to Hernández's appeal lies buried in the Spanish tapes, which are beyond our scope of review. It is difficult to tell from Agent Cases' brief snippets of the intercepted conversations how much the appellant knew about the conspiracy and how much he participated in it. For instance, though Agent Cases testified that a co-conspirator told Hernández to "get some drugs," Agent Cases failed to explain Hernández's reaction to this instruction. On the basis of the English language record, then, we do not know whether Hernández understood what was he was being told, whether he agreed to get the drugs, or whether he refused to do so. Similarly, Agent Cases testified that on May 19, 1997, Hernández told a co-conspirator that they were in the process of receiving a drug load. However, Hernández does not include himself in the statement. In other words, the appellant does not say "we" are in the process of receiving a drug load, but rather "they" are in the process of receiving a drug load. This statement corroborates

---

[12] Though Ortiz dealt with the crime of aiding and abetting, its general principles apply with equal force to the crime of conspiracy. See United States v. Aponte Suarez, 905 F.2d 483, 491 (1st Cir. 1990).

Hernández's claim that he knew of the illegal drug scheme but did not actively participate in it.

Furthermore, Hernandez's claim that he was convicted for merely being associated with the co-defendants is corroborated by the prosecution's tactics at trial. The prosecution repeatedly tried to link Hernández to the conspiracy by virtue of his mere presence. For example, the prosecution stated, "This call is between -- not [Hernández], but it's between the pertinent parties. It's not between [Hernández], but it is [Hernández]." And on another occasion the prosecutor again revealed his tactic, "And even though [Hernández] is not -- he's not part of the incriminating call, he's there and he's present during this telephone conversation."

Given the appellant's plausible claim of innocence, combined with the sheer volume of the untranslated evidence and its importance to the government's case, we find that Hernández has demonstrated that the untranslated evidence has the potential to affect our conclusion that there is sufficient evidence to support his conviction. We therefore vacate his conviction and remand his case for a new trial.[13]

---

[13] Our ruling should in no way be construed as establishing a per se rule that Jones Act violations constitute reversible error. Rather, we hold that the violation of the English language requirement in this case has the potential to affect our disposition of the appeal, in light of the size of the untranslated evidence, its importance to the prosecution's case, and the appellant's plausible claim of innocence.

B.  Toro-Santiago's Sufficiency Challenge

Toro-Santiago also challenges the sufficiency of the evidence upon which his conviction rests. Like Hernández, Toro-Santiago argues that the government failed to establish his active participation in the drug conspiracy.

After reviewing the English language evidence presented against the appellant, we again find that there is sufficient evidence in the English language record to sustain Toro-Santiago's conviction.  First, Agent Cases testified to several telephone conversations that Toro-Santiago had with co-defendant Naranjo-Rosa in which they discussed their drug trafficking activities, using terms such as "hydraulic oil" and "bits" to refer to drugs and "madera" to refer to money.  Second, Special Agent Harold Clouse testified that the notebooks seized from Toro-Santiago's residence contained notations "in the format of those that would be kept by an illegitimate heroin distribution network."  Lastly, cooperating witnesses Daniel Sánchez-Ortiz and Alberto Negrón-Constantino testified that they purchased drugs from Toro-Santiago during the period of the charged conspiracy.

Drawing all legitimate inferences in favor of the prosecution, the evidence establishes that Toro-Santiago was an active member of the drug conspiracy who was familiar with its coded drug references, kept records of its dealings, and furthered its purpose by selling drugs to two of the government's witnesses. See Aponte-Suarez, 905 F.2d at 490 ("A conspiratorial agreement may be proven by circumstantial evidence, and the plan may be inferred

from a development and collation of circumstances." (internal citations omitted)).

We therefore find sufficient evidence in the English language record to sustain Toro-Santiago's conviction; however, in order to actually affirm appellant's conviction, we must conclude that the untranslated evidence does not have the potential to affect our disposition of this issue.  Much to the prosecution's chagrin, we cannot so conclude.

As noted, the size and importance of the untranslated evidence weigh in favor of concluding that the tapes have the potential to affect our sufficiency determination.  There is, however, one additional argument which we find conclusive: in much of Agent Cases' testimony of Toro-Santiago's conversations, it is unclear who is actually making the drug references and what, if anything, is being planned.  For example, after listening to a Spanish language conversation between Toro-Santiago and Naranjo-Rosa, Agent Cases testified that the references on the tape to "formicas" and "10 by 10s" were actually coded references to drugs. The problem, however, is that Agent Cases does not identify Toro-Santiago as the person who used the coded phrases, nor does he explain whether a sale or purchase was being arranged.  Though we can infer based on the English language evidence that Toro-Santiago actively participated in these drug discussions, that inference could not be drawn if contradicted by evidence in the tapes.

According to the appellant, the Spanish tapes demonstrate that he was aware of the illegal drug scheme, but that he did not actively participate in it.  See Aponte-Suarez, 905 F.2d at 491 (ruling that mere knowledge of a drug importation scheme is insufficient to establish guilt).  If the Spanish tapes were to corroborate Toro-Santiago's claim by demonstrating that it was Naranjo-Rosa making most of the coded references to drugs, it would become more difficult to claim that Toro-Santiago actively participated in the conspiracy.

The force of this argument is compounded by the fact that the Spanish tapes are the only reliable connection between Toro-Santiago and the conspiracy.  Neither the notebooks found in Toro-Santiago's residence nor the cooperating witnesses specifically connected the appellant to the charged conspiracy. With respect to the notebooks, there was no evidence offered regarding who authored them.  Moreover, Agent Clouse admitted in two prior FBI reports that "the notations lack sufficient class and/or individual characteristics to make a determination as to the exact purpose and/or function of these records." With respect to the cooperating witnesses, they testified to purchasing drugs from Toro-Santiago in 1995.  Though this testimony demonstrates that Toro-Santiago may have sold drugs to individual consumers, it does not connect him with any of the other conspirators or to the charges in the indictment.

Given the size and importance of the untranslated evidence, compounded by the fact that Toro-Santiago's claim of

innocence is plausible in light of Agent Cases' ambiguous testimony, we find that the untranslated evidence has the potential to affect our resolution of this issue.  We therefore reverse Toro-Santiago's conviction and remand his case for a new trial.

C.  Naranjo-Rosa's Sentence

Naranjo-Rosa argues that there is insufficient evidence in the record to support the sentence the district court imposed on him.  At sentencing, the court attributed 4,000 kilograms of marijuana, or 20 kilograms of cocaine,[14] to Naranjo-Rosa, resulting in a base offense level of 34 under the Sentencing Guidelines.  According to the appellant, this sentence is unsupported by the Spanish tapes.

In analyzing Naranjo-Rosa's claim, we review for clear error.  See United States v. Lewis, 40 F.3d 1325, 1343 (1st Cir. 1994).  After employing this standard of review, we find that there is sufficient evidence in the English language record to affirm Naranjo-Rosa's sentence.  There are at least eleven conversations during April and May of 1997 in which Naranjo-Rosa directly coordinated the sale or purchase of more than 20 kilograms of cocaine.  On the basis of the English language evidence, then, we must conclude that the district court did not err in its sentencing determination.

Having determined that there is sufficient evidence in the English language record to affirm Naranjo-Rosa's sentence, we

---

[14]  The conversion of marijuana amounts to cocaine amounts is based on the formula set forth in the Sentencing Guidelines.  See U.S.S.G. § 2D1.1 cmt. n.10.

examine whether the untranslated evidence has the potential to affect our conclusion.  The appellant argues that the Spanish tapes do not support the district court's determination.  For instance, he points out that the Spanish tape upon which the district court relied to attribute "1200 pounds of marijuana" to him does not even mention the number 12 or 1200.  In fact, Naranjo-Rosa argues that the only number cited in that tape is "one-thousand two," which refers not to pounds of marijuana, but to a drug price.

It is undisputed that the district court calculated the drug quantity attributable to Naranjo-Rosa by relying exclusively on the Spanish language tapes:

> But let me explain and justify my sentence.
> In this case, the explicit amounts that can be
> pinpointed in the record, I will explain them
> and I will point them out.   Government's
> Exhibit 2. . . . Also Government's Exhibit 4.
> . . . Also Exhibit 44. . . . Also there is
> Exhibit 55 . . . .

Since the district court relied exclusively on the Spanish tapes to calculate appellant's sentence, there is no way for us to determine whether its recollection of the Spanish tapes is flawed.

More importantly, we are unable to review whether Agent Cases' testimony regarding drug quantities accurately reflects the content of the Spanish tapes.  Because we cannot examine the Spanish tapes to make sure that they are consistent with the English language evidence supporting the district court's drug quantity determination, we must conclude that the Spanish tapes have the potential to affect our disposition of this issue.

For the purposes of determining the appropriate sentence on remand, the district court is not limited in the same manner as we are regarding the sufficiency of the evidence to establish guilt, which depends only on the English language evidence heard by the jury. Rather, the district court can, and should, review a certified English translation of the Spanish tapes to ensure that the tapes corroborate Agent Cases' testimony regarding drug quantities. See, e.g., United States v. Berzon, 941 F.2d 8, 21 (1st Cir. 1991) ("Generally, there is no limitation on the information which a court may consider in sentencing other than that the information bear sufficient indicia of reliability to support its probable accuracy, and evidence not ordinarily admissible under the rules of evidence at trial may be considered."). Only then will the Spanish tapes be stripped of their potential to undermine the district court's sentencing determination. With these instructions, we remand the case for re-sentencing.[15]

D. Rivera-Rosario's Sentencing Challenge

Similarly, appellant Rivera-Rosario argues that there is insufficient evidence in the record to support the district court's attribution of 150 kilograms of cocaine to him. Again, though there is sufficient evidence in the English language record to affirm appellant's sentence, we find that the untranslated evidence has the potential to affect our conclusion because we are unable to

---

[15] Because our resolution of this issue calls for re-sentencing, it is unnecessary to address any of the other arguments advanced by Naranjo-Rosa regarding his sentence.

determine whether Agent Cases' testimony is an accurate reflection of the content of the Spanish tapes. We therefore remand the case for re-sentencing.[16]

## III.

Returning to charted waters, we direct our attention to the challenges Collazo-Arroyo, Rivera-Rosario, and Naranjo-Rosa raise to their convictions that do not implicate the untranslated evidence.

A.  Collazo-Arroyo's Voice Recording Challenge

Collazo-Arroyo's sole argument on appeal is that the district court erred in permitting the jury to hear an exemplar of his voice that was recorded without his permission when he was in prison.[17] Collazo-Arroyo admits that he signed a consent form allowing the government to monitor his telephone calls from prison; however, he argues that he did not consent to having his voice recorded for the purpose of providing an exemplar at trial.[18] Because the government allegedly transcended the scope of his consent, he concludes that his Fourth Amendment rights have been violated.

---

[16] Because our resolution of this issue calls for re-sentencing, it is unnecessary to address any of the other arguments advanced by Rivera-Rosario regarding his sentence.

[17] Rivera-Rosario joins Collazo-Arroyo in making this argument.

[18] Rather, the consent form Collazo-Arroyo signed indicated that his calls would be monitored only to "preserve the security and orderly management of the [prison] and to protect the public."

Though Collazo-Arroyo objected to the admission of the exemplar at trial, he failed to file a pretrial motion to suppress the recordings, as required by Federal Rule of Criminal Procedure 12(b)(3). Rule 12(b)(3)'s mandate that all motions to suppress be presented prior to trial is based on the concern that "interrupt[ing] the course of the trial for such auxiliary inquiries impedes the momentum of the main proceeding and breaks the continuity of the jury's attention." Nardone v. United States, 308 U.S. 338, 342 (1939); see also Jones v. United States, 362 U.S. 257, 264 (1960) (stating that this rule deals "with carrying out an important social policy and not a narrow, finicky procedural requirement"). Appellant's failure to comply with the requirements of Rule 12(b)(3) operates as a forfeiture to challenge the subsequent admission of the evidence during the trial. See Fed. R. Crim. P. 12(f).[19]

Even though the district court ultimately addressed the forfeited issue on the merits, we enforce Rule 12(f) forfeitures "unless the appellant can show 'cause' for failing to raise it in a pretrial motion." United States v. Bashorun, 225 F.3d 9, 14 (1st Cir. 2000) (quoting United States v. Núñez, 19 F.3d 719, 722 (1st Cir. 1994)). Collazo-Arroyo has failed to offer any justification for his belated request to suppress the voice recordings. We therefore conclude that the voice exemplar was properly admitted at trial. Since the untranslated evidence does not have the potential

_____

[19]  The district court did not grant Collazo-Arroyo relief from his Rule 12(f) forfeiture.

to affect our resolution of this issue, we affirm Collazo-Arroyo's conviction.

B.  Rivera-Rosario's Challenges to the District Court's Rulings

Rivera-Rosario challenges two rulings made by the district court in an effort to expose reversible error.  First, he claims that the district court erred in admitting the expert testimony of Agent Cases.  Second, he argues that the district court's decision to admit Agent Cases' expert testimony unconstitutionally shifted the burden of proof to the defense. Because we do not find any reversible error in the district court's rulings, we reject appellant's arguments.

Rivera-Rosario's claim that the district court erred in admitting Agent Cases' testimony rests on the premise that Agent Cases was unqualified to provide expert testimony.  According to the appellant, Agent Cases did not have the training or expertise necessary to give accurate interpretations of the coded drug phrases.  See Fed. R. Evid. 702 (permitting use of expert testimony only if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence").

Normally, we would review a district court's decision to qualify an expert witness for manifest abuse of discretion.  See United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995). However, where, as here, the appellant failed to raise this issue in the district court, we review for plain error.  See Fed. R. Crim. P. 52(b); Olano, 507 U.S. at 732-33.  The plain error standard requires that the appellant demonstrate that: (1) there

was error; (2) it was plain; (3) it affected the substantial rights of the accused; and (4) the error affected the "fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732-36. In this case, the appellant cannot even surmount the lowest hurdle of the four-prong test -- namely, demonstrating that an error occurred.

Agent Cases' qualifications as a drug expert in coded conversations are, in fact, sufficient. See generally Richmond Steel Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 20 (1st Cir. 1992) ("Trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses."). At the time of the trial, Cases had been working as an agent with the FBI for approximately eight years, specializing in drug investigations in Texas and Puerto Rico. During this period of time, he conducted approximately twenty-five investigations that involved interviewing drug trafficking informants and cooperating witnesses, securing wiretap orders, and monitoring intercepted conversations. Many of these intercepted conversations, which were in English and Spanish, involved heavily coded references to drugs and narcotic trafficking. See United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) ("In a rough-and-ready field such as [drug trafficking], experience is likely the best teacher."). In addition to his professional experience, Agent Cases received FBI training on how to conduct drug investigations and how to decipher coded references. Given Agent Cases' experience and training, we

conclude that the district court did not err in qualifying him as an expert.

Second, Rivera-Rosario argues that the admission of Agent Cases' expert testimony unconstitutionally shifted the burden of proof to the defendant. More specifically, appellant argues that since Agent Cases testified both as a fact witness (offering details of his investigation of the defendants) and as an expert witness (providing his interpretation of the coded drug references), the jury was given the false impression that the agent's opinion regarding the criminal nature of the defendants' coded language was based on his investigation of the defendants, rather than on generalizations from other experiences. According to Rivera-Rosario, he was forced to correct this false impression, thereby unconstitutionally shifting the burden of proof onto the defense.

Even if we were to accept the logic of the appellant's argument, the facts do not support his claim. Throughout his direct examination, Agent Cases was clear that his interpretation of the defendants' coded language was based on his previous experience. For instance, when asked to explain why he believed that the defendants' use of the word "checks" was a reference to cash, he responded, "I have extensive experience in money laundering investigations, and in particular, there was one case that I worked on where [the word "checks"] was very commonly used by the drug traffickers to refer to . . . [cash]." Given this candor, there was no need for the defendant to elicit any evidence

regarding the basis of Agent Cases' testimony.  Because the burden of proof did not migrate to the defense, we do not discern any reversible error and affirm Rivera-Rosario's conviction.[20]

C.  Naranjo-Rosa's Challenge to the Wiretap Evidence

Naranjo-Rosa claims that the district court erred in denying his motion to suppress the intercepted conversations. Specifically, he argues that the government's application for a wiretap was defective in that it failed to satisfy the necessity requirement, pursuant to 18 U.S.C. § 2518(1)(c).[21]  In the alternative, Naranjo-Rosa claims that the district court erred in denying him an evidentiary hearing on the government's application for a wiretap.  Finding no reversible error, we reject appellant's arguments.

First, Naranjo-Rosa claims that the government failed to meet the necessity requirement set forth in 18 U.S.C. § 2518(1)(c),

[20]  In addition, appellant argues that this Court should adopt a rule that prevents district courts, when weighing a motion for acquittal under Rule 29, from considering the opinion testimony of government agents who interpret allegedly coded conversations. Because Rivera-Rosario did not raise this issue below, we review for plain error. See United States v. DeLeón, 187 F.3d 60, 65 (1st Cir. 1999).  Appellant concedes that his argument is based on a "change in the law." As such, his claim cannot survive plain error review, as he is unable to demonstrate that his argument rests on an "obvious or clear [error] under current law." Id.; see also United States v. Turman, 122 F.3d 1167, 1171 (9th Cir. 1997) ("If the district judge would have to be clairvoyant to detect the error (perhaps by foreseeing yet undecided court of appeals or Supreme Court caselaw) the error is not plain and defendant must object as a condition for having it considered on appeal.").

[21]  Naranjo-Rosa was joined by appellants Toro-Santiago and Hernández in raising this issue.

which is a precondition to obtaining a wiretap. Section 2518(1)(c) requires that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987) (quoting 18 U.S.C. § 2518(1)(c)). The necessity requirement was "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).

According to Naranjo-Rosa, the government failed to satisfy this requirement because traditional investigative techniques had not been exhausted before the government sought the wiretap. The appellant claims that the government could have uncovered more information about the conspiracy by using confidential informants to set up surveillance and to introduce undercover agents into the conspiracy.[22] Based on these neglected investigatory tactics, Naranjo-Rosa concludes that the government's reliance on wiretapping was premature.

Contrary to the appellant's assertions, however, the government is not required to show that other investigatory methods have been completely unsuccessful, see United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986), nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before

---

[22]  Appellant claims that the government could have relied on a cooperating witness named Ruiz-Adorno to infiltrate the conspiracy or to help undercover agents do the same.

-34-

resorting to electronic surveillance, see Hoffman, 832 F.2d at 1306. It is only required to show that it has made "a reasonable good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." Id.; see also United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995) ("[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." (citations and internal quotation marks omitted)).[23]

In this case we are satisfied with the government's showing of necessity. The government's application for a wiretap describes in detail the surveillance techniques which had been tried, such as physical surveillance, pen registers, closed-circuit television cameras, records checks, and debriefings. The government also described all the reasons why these tactics had been ineffective or limited in use. Moreover, the application lists other available methods which were not viable options, including the use of grand jury subpoenas and search warrants, which would have alerted the conspirators to the ongoing investigation. Not only is the government's application complete, but it also demonstrates the significant lengths to which the

---

[23] When reviewing a wiretap application, "[i]t is not our province to engage in de novo review of an application; instead, we test it in a practical and commonsense manner to determine whether the facts which it sets forth are 'minimally adequate' to support the findings made by the issuing judge." United States v. Cole, 807 F.2d 262, 268 (1st Cir. 1986) (quoting U.S. v. Bynum, 763 F.2d 474, 476 (1st Cir.1985)) (internal quotation marks and citations omitted).

government went before resorting to electronic surveillance.  See e.g., United States v. Davis, 940 F.2d 722, 728-29 (1st Cir. 1991) (holding that the necessity requirement was shown even though government had not attempted to use search warrants, pen registers, or undercover agents).

In response, Naranjo-Rosa claims that the evidence that the government obtained from less intrusive investigatory methods provided sufficient information about the target organization, thereby eliminating the need for wiretaps.  Though the government's less intrusive methods had provided some valuable assistance in the investigation, much of the conspiracy's scope and dealings were still undisclosed.  Specifically, the government was still unaware of the identity of many of the conspiracy's members and the supplier of its drugs.  Moreover, at the time of the application, the government had no real knowledge of the organizational structure of the drug conspiracy.  Under these circumstances, it was sensible for the district court to allow the government to employ electronic surveillance in order to uncover the complete range of operations of the target organization.  Cf. United States v. Scibelli, 549 F.2d 222, 227 (1st Cir. 1977) ("A large-scale gambling conspiracy may by its structure and modus operandi give rise to a reasonable inference that other investigative procedures . . . reasonably appear to be unlikely to succeed if tried." (internal citations omitted)).

In the alternative, Naranjo-Rosa claims that the district court erred in denying him an evidentiary hearing on the

government's application for a wiretap. He claims that he presented the district court with sufficient evidence of duplicity in the government's affidavit to secure the wiretap so as to warrant an evidentiary hearing on the issue.

In order to obtain the requested evidentiary hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 154-56 (1978). Material omissions in a government's application are also sufficient to constitute the basis for a Franks evidentiary hearing. See United States v. Parcels of Land, 903 F.2d 36, 46 (1st Cir. 1990). "A district court's determination, however, that the requisite showing has not been made will be overturned only if clearly erroneous." Id.

To support his argument that he was entitled to an evidentiary hearing, Naranjo-Rosa claims that the government made a material omission in its affidavit supporting the wiretap. He claims that the government failed to disclose that they knew of a witness, Angel Ruiz-Adorno, who had a cooperation agreement with the government and had information on some of the investigation's targets.

Because we find that Ruiz-Adorno had no relevant information regarding the charged conspiracy, we conclude that the government's omission was not sufficiently material to warrant a

-37-

<u>Franks</u> hearing.[24]  Ruiz-Adorno had some knowledge of one co-conspirator's activities that occurred between 1992 and 1993.  This knowledge, however, was immaterial to the government's investigation for several reasons: (1) any information that Ruiz-Adorno had fell outside the scope of the charged conspiracy, as the indictment alleged a conspiracy beginning in 1994; (2) the wiretap application was submitted in April 1997, by which time Ruiz-Adorno's information was so stale as to be unhelpful; and (3) Ruiz-Adorno had been in custody for two years prior to the date of the government's wiretap application, which corroborates the little value that his information had with regard to the ongoing investigation.  Because Ruiz-Adorno's knowledge was immaterial to the investigation, the district court did not err in denying Naranjo-Rosa's request for a <u>Franks</u> hearing.  <u>See</u> <u>United States</u> v. <u>Paradis</u>, 802 F.2d 553, 558 (1st Cir. 1986) ("The <u>Franks</u> holding has been extended to affidavits plagued with <u>material</u> omissions." (emphasis added)).

## CONCLUSION

With a disturbing frequency, district courts in Puerto Rico have allowed parties to offer briefs, documents, and testimony in Spanish without translation.  Though we recognize that most jurors, and even judges, in Puerto Rico may be more comfortable speaking in Spanish than in English, district courts must be

---

[24]  In addition, because Ruiz-Adorno did not have any information that could have helped the government's investigation of this conspiracy, the defendants cannot rely on him to demonstrate that the government failed to meet the necessity requirement.

-38-

faithfully committed to the English language requirement.  If not, the District of Puerto Rico risks disassociating itself from the rest of the federal judiciary.  More importantly, appellate courts cannot properly review district court convictions on the basis of translations, later claimed as evidence, that were neither read nor heard by the jury.

For the foregoing reasons, we affirm the convictions of Rivera-Rosario, Naranjo-Rosa, and Collazo-Arroyo; reverse the convictions of Toro-Santiago and Hernández; and remand the cases of Rivera-Rosario and Naranjo-Rosa for re-sentencing, and the cases of Toro-Santiago and Hernández for a new trial.

**<u>Affirmed, reversed, and remanded</u>**.