# United States Court of Appeals
## For the First Circuit

---

Nos. 12-1693,
12-1769

UNITED STATES OF AMERICA,

Appellee,

v.

HERIBERTO MILLÁN-ISAAC;
JOSÉ A. CABEZUDO-KUILAN,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

---

Before
Torruella, Baldock,* and Kayatta,
Circuit Judges.

---

Megan Barbero, with whom Wilmer Cutler Pickering Hale and Dorr LLP, Gregory P. Teran, and Rachel I. Gurvich, were on brief for appellant Cabezudo-Kuilan.
Julie Soderlund, for appellant Millán-Isaac.
Juan Carlos Reyes-Ramos, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee.

---

April 18, 2014

---

*  Of the Tenth Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendants-Appellants José Cabezudo-Kuilan ("Cabezudo") and Heriberto Millán-Isaac ("Millán") pled guilty to aiding and abetting a robbery and possessing a firearm during a crime of violence. At back-to-back sentencing hearings, the district court first sentenced Millán to 180 months of imprisonment and then sentenced Cabezudo to 114 months of imprisonment. Immediately after sentencing Cabezudo, however, the sentencing judge sua sponte elected to bring back Millán and to decrease his sentence from 180 to 120 months of imprisonment.

On appeal, both Appellants challenge their respective sentences. Cabezudo alleges that the district court violated the Jones Act by considering untranslated, Spanish-language text messages during his sentencing and that his sentence is procedurally unreasonable. Millán claims that the district court erred by sentencing him on the basis of factual information discussed at Cabezudo's sentencing hearing for which he was not present and to which he could not respond. After careful consideration, we find that the district court plainly erred in sentencing both Appellants, and we thus remand for resentencing.

## I. Background

### A. Factual and procedural background

In November of 2011, Cabezudo was nineteen years old, working as a welder and supplementing his income by loaning money to others and charging interest. Millán was twenty-one years old

and working part-time as a sales person in a clothing store. Cabezudo provided Millán with a loan of $150, to be paid back in installments of $40 every Saturday. When Millán was unable to make one of these scheduled payments, Cabezudo suggested via text message that Millán commit a robbery in order to get the money to repay him. Millán agreed on the condition that Cabezudo act as the getaway driver.

On November 26, 2011, Cabezudo drove to Millán's home, picked him up, and drove to a Burger King in Bayamón, Puerto Rico. That night, while Cabezudo waited in the car, Millán entered the restaurant, showed the cashier an unloaded firearm, and told her to give him the money from the register. The cashier complied and placed $114 on the counter, which Millán grabbed before running out the door. The Burger King's manager followed Millán, however, and he quickly flagged down nearby police officers who were patrolling the area. Shortly after Millán reentered Cabezudo's car, the police officers approached the vehicle. Cabezudo turned off the ignition, and the duo surrendered.

Following their arrest and pursuant to their plea agreements, both Cabezudo and Millán pled guilty to aiding and abetting each other in the commission of a robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 ("Count One"), and to possessing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Two"). Cabezudo's plea agreement provided

a base offense level of 20 for Count One, reduced by 3 levels for acceptance of responsibility. Pursuant to the U.S. Sentencing Guidelines, this resulted in a Guidelines Sentence Range ("GSR") of 24-30 months for Count One, and the government agreed to recommend a 24-month sentence. For Count Two, the Guidelines sentence was equivalent to the mandatory minimum sentence of 60 months, which the government agreed to recommend, for a total recommendation of 84 months of imprisonment on the two counts. The Pre-Sentencing Report ("PSR") confirmed these Guidelines calculations.

Millán's plea agreement resulted in an identical GSR of 24 to 30 months for Count One, with the government similarly agreeing to recommend a low-end sentence of 24 months of imprisonment. Unlike Cabezudo, however, Millán pled guilty to "brandishing" the firearm on Count Two, which carried a higher mandatory minimum of 84 months, for a total recommendation of 108 months of imprisonment.

**B. Sentencing**

On April 23, 2012, the district court conducted back-to-back sentencing hearings for Millán and Cabezudo, with Millán appearing first. The sentencing judge calculated Millán's GSR as to Count One to be 24 to 30 months, and he noted that the statutory minimum for Count Two was seven years (84 months) of imprisonment. The judge then determined that an upward variance was appropriate and announced a sentence of 60 months of imprisonment on Count One

and 120 months on Count Two, to run consecutively. Defense counsel for Millán did not object to the sentence, and Millán left the courtroom.

The district court then proceeded to sentence Cabezudo. Cabezudo's attorney argued at length that the court should accept the 84-month sentence recommended in the plea agreement. To this end, counsel for Cabezudo proceeded to summarize a text message exchange between Cabezudo and Millán that he believed showed that Cabezudo's decision to participate in the robbery was uncharacteristic and a "spur of the moment thing" that he was initially reluctant to do. According to counsel, although Cabezudo first suggested the robbery as a means for Millán to pay him back, when Millán asked him to join in the robbery, he hesitated and demonstrated reluctance to participate before eventually agreeing.

After counsel finished summarizing the messages, the sentencing judge asked if a written version of the text messages was available. Defense counsel could not find a copy of the text messages, so the sentencing judge said that he was willing to accept the summary as accurate. The government agreed that defense counsel's summary of the texts was accurate. At that point, however, the Probation Officer located a copy of the text messages -- untranslated and in Spanish -- and provided it to the sentencing judge. The judge then read the messages from the bench and briefly discussed them with counsel.

At the conclusion of Cabezudo's sentencing hearing, the district court announced that it was "going to impose the high end of the Guidelines on the robbery, which is 30 months. And I am going to impose 84 months on the gun, consecutive." When defense counsel protested that the plea agreement's recommendation of 84 months was sufficient, the court responded in an unusual manner, commenting that "the sentence I imposed on the other gentleman perhaps is too high, and we're going to change them both."

Then, immediately after Cabezudo's sentencing hearing ended, the court recalled Millán. During the course of a minute, the court confirmed that Millán's counsel had been present during Cabezudo's sentencing and noted that his previously announced sentence was "too high." The judge then stated that "[o]n the basis of what we were able to get to know, on the basis of the sentence of the codefendant, and on the basis of what we have discussed, I think perhaps I should lower the sentence imposed on your client." The district court proceeded to sentence Millán to 30 months on Count One and 90 months on Count Two for a combined sentence of 120 months of imprisonment. Millán's counsel thanked the court, and the proceeding concluded.

On May 7, 2012, Cabezudo filed a motion for reconsideration, arguing that his 114-month sentence was unreasonable in light of his history and the circumstances of the offense. The district court denied the motion, stating that "[t]he

record at sentencing, and the text messages exchanged between the two defendants and read by the court confirm that this was a coldly-planned robbery."  This timely appeal followed.

## II.  <u>Analysis</u>

On appeal, Cabezudo contends that the district court's reliance on untranslated, Spanish-language text messages at sentencing violated section 42 of the Jones Act, which requires that "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico . . . be conducted in the English language."  48 U.S.C. § 864 ("Jones Act" or "English-language requirement").  Additionally, he argues that his sentence is procedurally unreasonable because the district court failed to calculate the applicable GSR and failed to adequately explain its sentence.  Millán contends that the district court erred by considering new, material information at his sentencing hearing that he had no meaningful opportunity to rebut.  We address the claims of each Appellant in turn.

### A. Cabezudo

#### 1. The Jones Act

Cabezudo argues that the district court violated the Jones Act by relying on untranslated, Spanish-language text messages during sentencing.  He suggests that we must vacate his sentence because the untranslated messages could have been outcome-determinative and we are unable to review them on appeal.  Before

we can address the merits of Cabezudo's argument, however, we must first address the government's contention that Cabezudo effectively waived his Jones Act claim below and cannot appeal from a "situation he created." In the government's view, Cabezudo's failure to object to the Spanish-language texts before the district court ought to constitute waiver because Cabezudo's counsel invited the error when he "first brought up the text messages and encouraged the court to review the same." We disagree.

As an initial matter, we note that "it is the independent duty of the district court to make sure that '[a]ll pleadings . . . be conducted in the English language.'" United States v. Rivera-Rosario, 300 F.3d 1, 6 (1st Cir. 2002) (quoting 48 U.S.C. § 864). This duty must not be taken lightly, as it ensures that the District of Puerto Rico remains an integrated part of the federal judiciary. See Estades-Negroni v. Assocs. Corp. of N. Am., 359 F.3d 1, 2 (1st Cir. 2004) (discussing the importance of the English-language requirement). We have repeatedly characterized the policy interest of integration as "too great to allow parties to convert that court into a Spanish language court at their whim," Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008) (quoting Rivera-Rosario, 300 F.3d at 8 n.9), and we reiterate that the duty of the court to ensure compliance with the Jones Act is not lessened in cases where counsel acquiesces or even

-8-

encourages the district court to set aside the English-language requirement. <u>Rivera-Rosario</u>, 300 F.3d at 8 n.9.

Although the district court's duty remains unchanged even in cases where defense counsel encourages the court to violate the Jones Act, the record makes clear that there was no such encouragement in this case, and that no waiver occurred. As the government concedes, waiver requires the "intentional relinquishment of a known right," not a mere failure to object. <u>United States</u> v. <u>Torres-Rosario</u>, 658 F.3d 110, 115-16 (1st Cir. 2011). In an effort to demonstrate intentional relinquishment, the government claims that Cabezudo's counsel encouraged the court to review the untranslated messages at sentencing. The record shows otherwise. While Cabezudo's counsel certainly introduced the subject of the text messages at sentencing, he did so by summarizing the contents of the messages in English. The district court then asked defense counsel if he had a copy of the messages with him, counsel explained that he did not, and the district court stated that it was willing to accept defense counsel's summary as accurate. At this point, the Probation Officer -- not Cabezudo -- retrieved her own copy of the untranslated messages and provided it to the sentencing judge for review. Far from encouraging the court to read the messages, Cabezudo's counsel said he was "concerned that it's not that simple of a document," noting that it involved sent and received messages and that he wanted to "make sure it's

-9-

clarified" and "make sure the Court got the right message." The sentencing judge responded by telling Cabezudo to deliver his allocution. On these facts, we cannot hold that Cabezudo intentionally relinquished his Jones Act claim, and we therefore proceed to analyze that claim on the merits.

"It is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English." Rivera-Rosario, 300 F.3d at 5. As a consequence, federal judges must not consider any untranslated documents placed before them. González-de-Blasini v. Family Dep't, 377 F.3d 81, 89 (1st Cir. 2004). This rule applies with equal force to all stages of federal court proceedings, including sentencing hearings. See United States v. Mescual-Cruz, 387 F.3d 1, 11 (1st Cir. 2004) (holding that failure to translate defendant's Spanish-language allocution at sentencing violated the Jones Act). We therefore hold that the district court erred by accepting and considering an untranslated copy of the text messages at Cabezudo's sentencing hearing.

Our finding of error does not end the matter, however, as not all Jones Act violations require reversal. Violations of the Jones Act "constitute reversible error whenever the appellant can demonstrate that the untranslated evidence has the potential to affect the disposition of an issue raised on appeal." Dalmau, 544

-10-

F.3d at 67 (quoting <u>Rivera-Rosario</u>, 300 F.3d at 10).[1]  "Absent that potential, there is no prejudice from the violation of the Jones Act that warrants relief."  <u>Rivera-Rosario</u>, 300 F.3d at 10. Similarly, if the untranslated evidence is merely cumulative, any prejudice to the parties caused by this court's inability to review

---

[1]  The government argues that <u>Rivera-Rosario</u>'s reversible error rule for unpreserved claims ought not to apply because this circuit confined <u>Rivera-Rosario</u> to its facts in <u>United States</u> v. <u>Morales-Madera</u>, 352 F.3d 1, 10 (1st Cir. 2003), and we have consistently reviewed unpreserved Jones Act claims for plain error ever since. The government is incorrect on both points.

First, <u>Morales-Madera</u> distinguished <u>Rivera-Rosario</u> but did not confine it to its facts.  According to <u>Morales-Madera</u>, which declined to apply <u>Rivera-Rosario</u>'s reversible error rule and instead reviewed for plain error, "the key distinction" between <u>Rivera-Rosario</u> and <u>Morales-Madera</u> was that the former involved a total failure to translate critical Spanish-language evidence at trial, while in the latter case, the jury was provided with the necessary translations at trial and the failure to enter those translations into evidence was subject to cure via Federal Rule of Appellate Procedure 10 ("Rule 10").  352 F.3d at 10.  In Cabezudo's case, as in <u>Rivera-Rosario</u>, the Spanish-language evidence was never translated below, making Rule 10 inapplicable.

Second, as this court's most recent Jones Act analysis makes clear, <u>Rivera-Rosario</u>'s reversible error rule is still binding in this circuit.  <u>See</u> <u>Dalmau</u>, 544 F.3d at 67 (citing <u>Rivera-Rosario</u> and reversing without evidence of any objection in the district court, so as to guard against parties at their whim turning the United States District Court in Puerto Rico into a Spanish language court).  To the extent that any of our intervening opinions imply that <u>Morales-Madera</u> altered the standard of review expressly set forth in <u>Rivera-Rosario</u> and as reinforced most recently in <u>Dalmau</u> for cases where essential Spanish-language evidence was never translated below, we decline to follow them.  <u>See</u> <u>United States</u> v. <u>Lizardo</u>, 445 F.3d 73, 88 (1st Cir. 2006) (finding that this court is bound by its precedent, "which only an en banc court can change").

-11-

untranslated evidence is inconsequential and will not require reversal. See id.

In this case, the sentencing judge expressly stated when denying Cabezudo's motion for reconsideration that "[t]he record at sentencing, and the text messages exchanged between the two defendants and read by the court confirm that this was a coldly-planned robbery." It is thus readily apparent that the text messages did bear on an issue that the court found dispositive at sentencing: namely, Cabezudo's planning of the robbery. Nevertheless, the government argues that we must affirm because any prejudice caused by the court's consideration of the untranslated messages was inconsequential given the purely corroborative nature of the messages. We agree.

Although Cabezudo argues that the untranslated messages could have been outcome-determinative because they were "the only source to which the district court referred for its information regarding the planning of the offense," the record does not support his claim.[2] As an initial matter, Cabezudo ignores two important

_____

[2] Similarly unsupported by the record is Cabezudo's assertion that reversal is appropriate because defense counsel and the district court disagreed as to the proper "interpretation" of the text messages. In truth, what Cabezudo calls a dispute over the meaning of the untranslated text messages is more accurately described as a complaint that the district court put too much weight on the fact that Cabezudo suggested Millán commit a robbery and too little weight on the fact that he was hesitant to participate and only suggested it because he knew Millán routinely did such things. The record shows, however, that the sentencing judge understood and accepted both facts. The court expressly acknowledged that

sources of information: the PSR, and the statements of Cabezudo's counsel at sentencing.  The PSR -- to which Cabezudo did not object -- describes the planning of the event in detail and in a manner entirely consistent with the discussion at sentencing. Specifically, the PSR states that Cabezudo knew Millán had robbed before, and that his desire to be repaid prompted him to suggest that Millán commit a robbery.  He subsequently picked up Millán, drove to the Burger King, and waited in the car to act as the getaway driver in order to facilitate the crime.

Turning to the text message summary provided by Cabezudo's counsel at sentencing, we find a detailed discussion of precisely the same version of events:

> [DEFENSE COUNSEL]: [H]e says, listen, why don't you go do one of those [robberies] that you do.
>
> THE COURT: Who says that?
>
> [DEFENSE COUNSEL]: [Cabezudo] says that.
>
> THE COURT: Why don't you go and rob someone.
>
> [DEFENSE COUNSEL]: He says, that's not my problem. . . .  Get the money.  And [Millán] says, all right.  You have to come with me.
>
> . . . .

---

Cabezudo was not the "intellectual author" of the crime and that he may have never robbed before, unlike his co-defendant.  That the court ultimately elected to place greater weight on the undisputed facts that Cabezudo suggested the robbery, picked up Millán, and drove him to commit the robbery does not evidence any factual disagreement as to the content of the untranslated messages.

-13-

> THE COURT: You told me himself he planted the idea in the other one.  He was lending money for interest. . . .  And the guy's not paying him.  And then he tells him, why don't you do one of these palitos, one of these robberies you make.
>
> . . . .
>
> [DEFENSE COUNSEL]: [Cabezudo] says it in passing, like, listen, that's not my problem.  Like, you're always robbing Burger Kings.  Go rob a Burger King.

The government subsequently agreed that defense counsel's summary was accurate, and the court accepted it as such.

When the sentencing judge did later read the untranslated messages from the bench,[3] he observed that "[o]n one occasion he says, you don't have any job to do today, palito, meaning a robbery, because I'm really active and I need the money."  Defense counsel responded by saying "we've already discussed that with the Court.  We've already addressed that, Judge.  That's exactly what we told the Court."  As defense counsel's own statements show, the untranslated text messages were cumulative, serving only to further corroborate both the PSR and the English-language text message summary provided by defense counsel.  Accordingly, we find that any prejudice resulting from the district court's consideration of the

---

[3]  The sentencing judge initially expressed confusion as to who had sent and received the messages he was reading, but the government quickly corrected the court by stating that Millán sent the message saying that the Burger King would be a "piece of cake."  Defense counsel agreed, adding that it reinforced their earlier point that Millán encouraged Cabezudo to join in the robbery.

untranslated messages was inconsequential and does not constitute reversible error. See Rivera-Rosario, 300 F.3d at 10 (characterizing as inconsequential the prejudice resulting from untranslated evidence that is cumulative).

**2. Reasonableness**

Having disposed of Cabezudo's Jones Act claim, we turn now to consider the reasonableness of his sentence. Cabezudo argues that his sentence is procedurally unreasonable for two reasons: first, the district court failed to calculate the applicable GSR, and second, the court did not adequately explain its sentence.

Typically, we review criminal sentences for reasonableness under an abuse-of-discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). Where no objection was raised at sentencing, however, we review for plain error. United States v. Fernández-Hernández, 652 F.3d 56, 71 (1st Cir. 2011); United States v. González-Castillo, 562 F.3d 80, 82 (1st Cir. 2009). To survive plain-error review and merit resentencing, a defendant must make four showings: (1) an error occurred, (2) that was clear or obvious, (3) that affected his substantial rights, and (4) that seriously impaired the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 732-37 (1993). Because Cabezudo did not raise any claim

of procedural error below, we review his claims under the demanding plain-error standard of review.

Our review of a criminal sentence's procedural reasonableness begins by considering whether the court committed a serious procedural error, such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-- including an explanation for any deviation from the Guidelines range." United States v. Innarelli, 524 F.3d 286, 292 (1st Cir. 2008). Accordingly, we start with Cabezudo's claim that the district court plainly erred by failing to calculate the applicable Guidelines sentence.

Although the Sentencing Guidelines are now advisory rather than mandatory, district courts are still required to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall, 552 U.S. at 49. Only after a court has correctly calculated the applicable GSR and evaluated the factors set out in 18 U.S.C. § 3553(a) can it properly exercise its discretion to sentence a defendant within or outside the applicable Guidelines range. Far from a meaningless exercise, the requirement that the district court begin by correctly calculating the GSR serves an important function; it provides a "framework or starting

-16-

point" to guide the exercise of the court's discretion.  Freeman v. United States, 131 S. Ct. 2685, 2692 (2011).  Starting with such a framework gives the sentencing judge "an idea of the sentences imposed on equivalent offenders elsewhere," which in turn "promote[s] uniformity and fairness" in sentencing.  United States v. Rodríguez, 630 F.3d 39, 41 (1st Cir. 2010).  Thus, even though sentencing judges are free to impose non-Guidelines sentences in appropriate cases, "district courts must still give respectful consideration to the now-advisory Guidelines (and their accompanying policy statements)."  Pepper v. United States, 131 S. Ct. 1229, 1247 (2011) (internal quotation marks omitted).

At Cabezudo's sentencing hearing, the district court announced that it was "going to impose the high end of the guidelines on the robbery, which is the 30 months."  This solitary statement constitutes the court's only reference to the applicable GSR at Cabezudo's sentencing.  The district court never identified the low end of the GSR for Count One, nor did it identify Cabezudo's criminal history category or offense level.  Worse yet, the court made no reference whatsoever to the Guidelines Sentence for Count Two before imposing a sentence of 84 months on that Count -- a full two years higher than the Guidelines sentence of 60 months.  See U.S. Sentencing Guidelines Manual § 2K2.4(b) ("[I]f the defendant . . . was convicted of violating section 924(c). . . .

of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute.").

The government, in an effort to persuade us that the sentencing judge did calculate the applicable GSR for Count Two, points us to the court's comment at the end of the hearing that it wanted to clarify that it did not use any departures because it saw no reason to, but that "when you look at it, the truth of the matter is this is a variance case." The government reasons that "a variance case" must have referred to Count Two because Count One was a within-Guidelines sentence. From this, the government posits that the court must have known that it was sentencing outside of the Guidelines on Count Two, which in turn suggests that the court properly calculated the applicable Guidelines before sentencing Cabezudo. We are not persuaded.[4]

Even if we were certain that the district court knew that it was imposing a variant sentence on Count Two, the sentencing transcript gives no indication that the court chose to do so after determining the correct Guidelines sentence. Taking the

---

[4] Similarly unconvincing is the government's argument that we should infer from the court's discussion of the applicable Guidelines at Millán's sentencing hearing that it must have known the correct Guidelines sentence for Cabezudo. Critically, this argument ignores the fact that Millán's Guidelines sentence for Count Two was 84 months while Cabezudo's was 60 months. If anything, the fact that the district court sentenced Cabezudo in a manner consistent with Millán's Guidelines sentence for Count Two -- after calculating only Millán's Guidelines sentence -- is additional cause for concern.

government's logic at face value, we can only assume that the district court thought the Guidelines advised something other than the sentence imposed. This does not suffice. Even where a district court concludes that a variant sentence is appropriate, it is still essential that the court begin by calculating the correct GSR. United States v. Ortiz, 741 F.3d 288, 294 (1st Cir. 2014) (remanding despite district court's stated intention to "do a small variance" where district court had improperly calculated the applicable GSR).

Given the district court's total failure at sentencing to calculate the applicable Guidelines sentence for Count Two, we are forced to conclude that the district court committed procedural error. We turn now to consider the consequences of this error. As we have previously made clear, a district court's failure to calculate conclusively a defendant's GSR is "a serious procedural error." United States v. Tavares, 705 F.3d 4, 26 (1st Cir. 2013) (citing Gall, 552 U.S. at 51). Accordingly, a finding that the district court so erred "will usually require resentencing." Rodríquez, 630 F.3d at 41. Nevertheless, the fact that the district court committed such a serious procedural error does not automatically entitle Cabezudo to resentencing. Tavares, 705 F.3d at 25.

In Tavares, this court found that resentencing was not required where the district court erred by failing to conclusively

determine the applicable GSR.  705 F.3d at 25-28.  We reasoned that the district court's failure to choose the correct GSR was harmless error because the court correctly calculated the two potential GSRs as recommended by the parties before clearly stating that it was going to sentence in such a way that the Guidelines calculation did not matter; the district court then imposed a sentence above both of the suggested Guidelines ranges, citing the nature of the offense and the goals of sentencing.  Id. at 27-28.  Significantly, we found that the sentencing judge in Tavares "did not fail completely to calculate Mr. Tavares's guidelines sentencing range or impose his sentence without any consideration of the Guidelines. . . . The district court clearly understood the options within the possible guidelines calculations and clearly rejected all of them as yielding too lenient a sentence."  Id. at 27.  We also noted that "[c]ases in which reversible error has been found involve[d] far less awareness of the applicable guidelines range than we find here," and that Tavares's case "stands in stark contrast to typical cases where a district court's failure to calculate a defendant's guidelines sentencing range has warranted a remand for resentencing."  Id. at 28 n.37 (citing United States v. Peebles, 624 F.3d 344, 347 (6th Cir. 2010)), as a "typical" case where resentencing was required because neither the attorneys nor the district court addressed the applicable GSR at all during the sentencing hearing).

In Cabezudo's case, however, the district court did "fail completely to calculate [his] guidelines sentencing range" and seemingly imposed its sentence for Count Two "without any consideration of the Guidelines." See id. at 27; see also Ortiz, 741 F.3d at 294. Accordingly, this is precisely the kind of "typical" case that we noted in Tavares would require remand for resentencing. Thus, we find that the district court's total failure to calculate the applicable GSR for Count Two was reasonably likely to have influenced Cabezudo's sentence and that it is appropriate to remand for resentencing.

Although the district court did later calculate the applicable GSR in its written statement of reasons, this belated consideration raises more concerns than it resolves, as the court wrote therein that it had sentenced Cabezudo to a within-Guidelines sentence. In fact, the 84-month sentence imposed by the court for Count Two exceeded the applicable Guidelines sentence by two years. Following on the heels of the district court's failure to calculate the applicable GSR, the court's evident confusion about the nature of the sentence imposed is troubling and further reinforces our belief that resentencing is necessary.

At the risk of piling on, we also note that the district court's handling of the statement of reasons form reveals another error. By statute, whenever a district court imposes a sentence outside the applicable GSR, the court must also state the "specific

-21-

reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form."  18 U.S.C. § 3553(c); see also Peugh v. United States, 133 S. Ct. 2072, 2084 (2013) ("[A] district court varying from the Federal Guidelines should provide an explanation adequate to the extent of the departure"); Gall, 552 U.S. at 51 (classifying as "significant procedural error" a district court's failure "to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range").  In this case, however, the court failed to offer any written explanation for its sentence whatsoever.  The court left blank the sections of the statement of reasons form calling for the court to explain its non-Guidelines sentence, and it instead checked a box indicating that it had imposed a within-Guidelines sentence.  Thus, the court's written statement of reasons for its sentence -- or, more precisely, the lack thereof -- is inadequate as a matter of law.

As we have already determined that resentencing is appropriate due to the district court's failure to calculate the applicable GSR, we need not press on to consider whether the court's failure to provide a written statement of reasons in light of its limited oral explanation[5] for an above-Guidelines sentence

---

[5]  At the sentencing hearing, the judge's explanation of Cabezudo's sentence took the following form:

> You got me to lower him from 180 in my mind to 114. . . .
> He was the one who picked him up, took him to the place,

-22-

constitutes plain error. Thus, although we express some reservations as to the adequacy of the explanation in this case, we go no further.[6]

We now turn our attention to Millán.

## B. Millán

For the first time on appeal, Millán argues that the district court erred at sentencing by considering evidence and information of which he had no notice. Specifically, Millán objects to the court's reliance on: (1) the government's proffer at sentencing regarding the impact of the robbery on the Burger King cashier, and (2) the text messages and other evidence of comparative responsibility discussed at co-defendant Cabezudo's sentencing. Arguing that he had no notice of either prior to his own sentencing hearing -- and thus no meaningful opportunity to respond -- Millán contends that reversal is required. As Millán

---

who suggested the robbery, make one of your palitos so you can pay the money you owe me back. . . . [Y]ou will notice that I did not make any use of departure, because I didn't find that there was any real reason, any particular reason to depart. Perhaps 5K 2.0. But when you -- when you look at it, the truth of the matter is this is a variance case.

[6] We note that our finding that Cabezudo's sentence is procedurally unreasonable and requires resentencing means that his challenge to the substantive reasonableness of his sentence need not be considered. See United States v. Rodríguez, 527 F.3d 221, 231 n.5 (1st Cir. 2008) (reasoning that because court vacated and remanded for resentencing, it was unnecessary to reach defendant's alternative argument, which challenged the sentence's substantive reasonableness).

failed to object to the court's consideration of this information below, his claim is subject to the demanding plain-error standard of review. See United States v. Mangone, 105 F.3d 29, 35 (1st Cir. 1997).

It is abundantly clear that a district court has broad discretion at sentencing to consider information pertaining to the defendant and the defendant's offense conduct. United States v. Zavala-Martí, 715 F.3d 44, 54-55 (1st Cir. 2013). This includes the ability to consider information from court proceedings at which the defendant was not present, such as a co-defendant's sentencing hearing. See United States v. Rivera-Rodríguez, 489 F.3d 48, 53 (1st Cir. 2007). The district court's discretion is not without limits, however, and one such limit requires the court to base its sentence only upon information with "'sufficient indicia of reliability to support its probable accuracy.'" United States v. Gallardo-Ortiz, 666 F.3d 808, 811 (1st Cir. 2012) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)). Relatedly, the district court must afford the defendant an opportunity to respond to the factual information offered against him at sentencing. See Cintrón-Echautegui, 604 F.3d at 6; see also U.S. Sentencing Guidelines Manual § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor."); Fed. R. Crim. P.

32(i)(1) ("At sentencing, the court: . . . must allow the parties' attorneys to comment on . . . matters relating to an appropriate sentence.").

Of course, a defendant's right to respond to the information offered against him at sentencing means very little without a right to notice of that information.  See United States v. Berzon, 941 F.2d 8, 18 (1st Cir. 1991) ("'Th[e] right to be heard has little reality or worth unless one is informed.'" (alteration in original) (quoting Burns v. United States, 501 U.S. 129, 136 (1991))); see also Irizarry v. United States, 553 U.S. 708, 715 (2008) ("[J]udges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues.").  This court has therefore held that "'a defendant may not be placed in a position where, because of his ignorance of the information being used against him, he is effectively denied an opportunity to comment on or otherwise challenge material information considered by the district court.'"  Rivera-Rodríguez, 489 F.3d at 54 (quoting Berzon, 941 F.2d at 21).  Accordingly, we have found remand necessary where a sentencing court relied on new and significant information gleaned from a co-defendant's sentencing hearing when that information was not in the record and the defendant was not present during his co-defendant's sentencing.  Berzon, 941 F.2d at

17 (rejecting government's claim of constructive notice where defense counsel knew of co-defendant's sentencing held three months prior but did not attend or request a transcript because co-defendant's sentencing hearing "was not part of a joint proceeding in which [the defendant] or his counsel took part"); see also Zavala-Martí, 715 F.3d at 55 (remanding for resentencing where "[a]ppellant was alerted to the ex parte meeting for the first time during the court's sentencing pronouncement, and he thus had insufficient notice and no opportunity to develop a response to any adverse information communicated there"). On the other hand, we have affirmed where "there is no indication from the record that the sentencing judge materially relied on any undisclosed testimony." Rivera-Rodríquez, 489 F.3d at 55. Thus, we scrutinize the record closely to determine whether the court considered new information at sentencing and if so, whether it materially relied on that information in crafting Millán's sentence.

In this case, as in Berzon, the record does reflect the court's consideration of new, significant information at sentencing. After Millán's allocution, the sentencing judge asked the government if it had anything to say. The government replied by stating it wanted to add that "the victim, the cashier . . . had in fact previously worked in another restaurant where a robber killed a cashier, so she was very [a]ffected by this robbery." Later in the hearing, when defense counsel informed the court that

-26-

she had "three persons who are willing to testify," the court responded by saying it did not need to hear from them because it was "going to go by what happened. . . . A young girl was freaked out, completely freaked out, destroyed emotionally by the fact that they pointed a gun at her to take 114 dollars." The sentencing judge then theorized that Millán likely did not ask the cashier politely for the money when he showed her the gun, and he announced that he was imposing a variant sentence of 60 months on the robbery count and 120 months on the gun count.

The government has not directed us to any information in the record describing either the cashier's personal history with similar crimes or the way that this particular robbery affected her. Our own review of the record reveals that no such information is contained in Millán's indictment, plea agreement, or PSR. It therefore appears that the district court's conclusion that the cashier was "destroyed emotionally" by the robbery was based primarily upon victim impact information proffered by the government for the first time at Millán's sentencing hearing. The consideration of such new information is particularly concerning here given the court's subsequent announcement that it would sentence Millán to 60 months on the robbery count -- a period of incarceration more than twice as long the government's recommended sentence. Cf. United States v. Curran, 926 F.2d 59, 60-64 (1st Cir. 1991) (reversing for resentencing where the sentencing judge

referenced victim impact letters not mentioned in the PSR or disclosed to defendant prior to sentencing and the court imposed a heavier sentence than was recommended by the government).  But this did not end the matter.

After announcing Millán's sentence and informing him of his right to appeal, the district court excused Millán from the courtroom and proceeded to conduct Cabezudo's sentencing hearing. During that hearing, the court commented that "the sentence that I imposed on [Millán] is perhaps too high, and we're going to change them both."  The court then took the unusual step of reconvening Millán's sentencing hearing, announcing that "[o]n the basis of what we were able to get to know, on the basis of the sentence of the co-defendant, and on the basis of what we have discussed, I think perhaps I should lower the sentence imposed on your client." Thus, both the chronology and the court's own words strongly suggest that the district court elected to adjust Millán's sentence on the basis of facts learned at Cabezudo's sentencing hearing, for which Millán was not present.[7]

---

[7]    A little more than halfway through Cabezudo's sentencing hearing, the sentencing transcript shows that the court asked the Marshals to get Millán from the cell block and return him to the courtroom so that he might hear Cabezudo's allocution.  Missing from the transcript, however, is any indication of when Millán actually returned.   According to Millán's counsel, who also represented him below, Millán did not return to the courtroom until "almost at the end of the hearing," long after the court had discussed the text-message exchange between the co-defendants and other relevant information.   The government did not dispute this assertion.

-28-

Accordingly, we must determine whether the information presented at Cabezudo's sentencing was already made known to Millán either in his PSR or elsewhere in the record, or whether the information was new. See Berzon, 941 F.2d at 20 ("The difficulty here . . . is that the testimony and argument at [the co-defendant's] sentencing included information not in the PS[R] nor otherwise in the record in [the defendant's] case."). What the court "got to know" and "discussed" during Cabezudo's sentencing hearing spans 39 pages. Among other things, the court heard that Cabezudo suggested the robbery as a means of repayment because he believed Millán routinely committed robberies, and that Millán agreed to participate only on the condition that Cabezudo help him with the robbery. The court read and discussed text messages suggesting that Cabezudo was initially reluctant to participate, but that he agreed to come with Millán's assurance that the Burger King would be "a piece of cake." And when defense counsel told the court that Cabezudo "was not the intellectual author of the crime," the court responded by saying "Of course not. [Millán] robs more than [Cabezudo]." Defense counsel clarified that Cabezudo had no criminal history, prompting the sentencing judge to reason that "maybe [Cabezudo] never robbed . . . [b]ut he knew [Millán] robbed."

Of this information received at Cabezudo's sentencing hearing, the only fact reflected in Millán's PSR is that he agreed

to participate in the robbery as a means of repaying Cabezudo. There is no discussion of either his inducing Cabezudo to assist him or of the co-defendants' relative roles in planning the offense -- a subject that was discussed at length during Cabezudo's sentencing. Additionally, nothing in Millán's PSR suggests that he had experience committing similar robberies. In fact, according to Millán's PSR, he had no known criminal history. Millán's counsel had previously emphasized precisely this point in an ex parte sentencing memorandum, asserting that Millán "is a first time offender without any prior criminal behavior whatsoever." The government never disputed this fact, and the only information the sentencing court heard to the contrary came from Cabezudo's sentencing hearing.

For a second time, then, we see the sentencing court seemingly adjusting Millán's sentence on the basis on facts outside the record, and we turn now to the question of whether this error merits reversal. Undoubtedly, the court's error was clear at the time of sentencing. See Rivera-Rodríguez, 489 F.3d at 53; Curran, 926 F.2d at 63 (holding that henceforth, where a sentencing court relies on extra-record factual information at sentencing, it "should disclose to the defendant as much as was relied upon, in a timely manner, so as to afford the defendant a fair opportunity to examine and challenge it."). We therefore turn to the question of whether Millán's substantial rights were affected by the court's

consideration of new, material information of which he had no notice prior to his sentencing. Essentially, Millán must show that the error "affected the outcome of the district court proceedings." Olano, 507 U.S. at 734.

The government apparently concedes that the information discussed at Cabezudo's hearing affected Millán's sentence, noting that "those arguments and information [discussed at Cabezudo's hearing] . . . persuaded the court to change its mind as to the circumstances of the offense." Nevertheless, the government argues that Millán's notice claim cannot survive plain error review because "the information presented at Cabezudo's sentencing hearing only benefitted Millán, who received a significant sentencing reduction as a result." We disagree.

The fact that the district court relied on extra-record information when reducing Millán's sentence from one above-Guidelines sentence to another does not negate the likelihood that had Millán been afforded an opportunity to respond to that information, his sentence may have been lower still. Indeed, the government's recommended sentence was 108 months, not the 120 imposed by the court. Under these circumstances, we cannot ignore the fact that both the victim impact evidence and the information discussed at Cabezudo's sentencing constituted new, material information. Particularly given the court's demonstrated interest in assessing the effect of crime on the community and the relative

roles of the co-defendants in this case,[8] Millán should have had the opportunity to respond to the extra-record information regarding his comparative culpability, his criminal history, and the impact of his offense on the victim before the court relied on it at his sentencing.

As Millán points out, had he been present at Cabezudo's sentencing hearing and given a second opportunity to address the court, he could have challenged the "unreliable" information presented at Cabezudo's hearing regarding the relative responsibilities of the two co-defendants, explained the meaning of the text messages read by the court, and disputed the court's unfavorable conclusion regarding his criminal history. Considering that even the 120-month sentence ultimately imposed by the district court exceeded the government's recommended sentence by a full year, we cannot ignore the likelihood that Millan's variant sentence was affected by the court's unanticipated reliance on extra-record, material information at his sentencing. See Curran, 926 F.2d at 63.

Based on the record before us, we find that it is reasonably likely that the court's erroneous consideration of new, significant information -- to which Millán had no meaningful

---

[8]   Indeed, at Cabezudo's sentencing hearing, the court described the significance of Cabezudo's allocution by observing that "he has to be brave enough to put his own case in his own perspective, so we can actually figure out what we're going to do with him.  Part of it is recognizing what you did and what the other guy did."

-32-

opportunity to respond -- affected the court's determination of his sentence. Recognizing further that "[p]rior notice is one of the most zealously guarded rights of criminal defendants. . . . [such] that disregard for it cannot help but have a denigrating effect on the fairness, integrity, and public reputation of judicial proceedings," Mangone, 105 F.3d at 36, we find that Millán's sentence should be vacated, and we remand for resentencing.[9]

As a final matter, we emphasize that nothing in this opinion should be read to suggest that the district court is not free to consider at resentencing either victim impact information or information presented at Cabezudo's sentencing hearing. Rather, we merely hold that the court must provide notice, and the opportunity to respond, before relying on such extra-record information.

### III. Conclusion

We are not unsympathetic to the significant time pressures felt by the district courts as they manage heavy dockets with limited resources. Nevertheless, we cannot overlook the serious procedural errors at issue in this case. The district court plainly erred by sentencing Cabezudo without calculating the applicable GSR and by sentencing Millán without providing him with

---

[9]  Because we find that resentencing is required, Millán's additional claims of procedural error at sentencing are moot, and his challenge to the substantive reasonableness of his sentence need not be addressed. See Rodríguez, 527 F.3d at 231 n.5.

notice and an opportunity to rebut the facts that formed the basis of his sentence. We therefore hold that the defendants' sentences are vacated and remanded for resentencing consistent with this opinion.

Of course, the district court remains free on remand to exercise its discretion to sentence the defendants within or outside of the applicable Guidelines ranges, and we take no view at this time as to the length of the sentences to be imposed. So long as the sentencing court affords proper notice and opportunity to be heard, begins by calculating the applicable Guidelines sentences, and adequately explains its sentences after consideration of the relevant sentencing factors, it is free to exercise its considerable discretion in crafting appropriate sentences for the Appellants.

**REMANDED FOR RESENTENCING.**