# United States Court of Appeals
## For the First Circuit

No. 14-1194

UNITED STATES OF AMERICA,

Appellee,

v.

VÍCTOR MANUEL CARELA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Selya, and Lynch,
Circuit Judges.

Patricia A. DeJuneas, with whom Sibbison & DeJuneas, was on brief, for appellant.
Susan Z. Jorgensen, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

November 4, 2015

**TORRUELLA**, **Circuit Judge**.  This appeal arises out of Defendant-Appellant Víctor Manuel Carela's ("Carela") involvement in a drug smuggling operation.  Carela was convicted on two counts: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine; and (2) possession with intent to distribute five kilograms or more of cocaine.  Finding no reversible error, we affirm his conviction and sentence.

## I.  Background

On September 16, 2012, a multi-agency[1] investigation was initiated in regard to suspected drug trafficking in the coastal area along Yabucoa and Maunabo, Puerto Rico.  At 4:00 a.m. in the morning of September 17, 2012, Border Patrol agents observed an unlit vessel approaching Maunabo.  The law enforcement officers participating in this investigation requested helicopter assistance from the Puerto Rico Police Department, which was shortly dispatched.  The helicopter spotted a thirty-three foot vessel and communicated its location to law enforcement officers on the ground.

Around this same time, officers led a tactical land approach in the area and discovered a red Ford Excursion surrounded

---

[1]  This investigation involved agents from the U.S. Customs and Border Patrol, U.S. Coast Guard, Puerto Rico Police Department, and Yabucoa Municipal Police Department.

by multiple gas tanks along with other supplies such as food and drink. Proceeding to the beach, officers uncovered 918.7 kilograms of cocaine hidden within the nearby bushes.

Later that day, officers for the Municipal Police of Yabucoa ("Yabucoa officers") were told that a shipment of drugs had been intercepted along the Maunabo coastline. The Yabucoa officers were instructed to patrol the area in order to locate individuals that may be linked to the intercepted shipment. The Yabucoa officers encountered Carela hitchhiking on a section of the PR-901 road that was two miles from the sea. When the Yabucoa officers approached Carela in a marked police vehicle, he jumped over the railing on the side of the road and down a precipice.

A few minutes later, the Yabucoa officers encountered Carela a second time. This time, the Yabucoa officers stopped their vehicle and approached Carela on foot. The Yabucoa officers asked Carela, who was dressed in jet skiing shoes and wet clothing, what he was doing in the area. Carela responded that he was collecting metal.[2] The Yabucoa officers continued to speak with Carela, who appeared agitated, tired and pale, and invited him to

---

[2] Carela did not have any metal on his person. Further, one of the Yabucoa Police officers that encountered Carela testified that she has never seen any individuals collecting metal in the area in which Carela was found.

drink some water in their car. While Carela was drinking water, the Yabucoa officers again asked him what he was doing in the area and Carela indicated that he had been on a boat. At this juncture, the Yabucoa officers arrested Carela and read him his rights. Carela had no identification or cell phone on his person and only a small amount of cash.

On the ride to the police station, Carela told the Yabucoa officers that he was supposed to be paid "$5,000 for the task, . . . but since it wasn't completed, he was not going to receive it." Later that day, Carela was interrogated by Agent Carlos Martínez, a Homeland Security agent. Agent Martínez testified that Carela appeared "excited," "happy," "pumped up," and "very cooperative" during his interrogation. Carela admitted to the agent that he was hired for this "drug smuggling venture [and] that his job was to refuel the vessel that was coming in with the narcotics." Carela further admitted that he assisted in the offloading of narcotics from the vessel.

Carela was indicted on: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine; and (2) possession with intent to distribute five kilograms or more of cocaine. 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii); 846. On April 22, 2013, Carela's first trial ended in a mistrial because the jury could not reach a unanimous verdict. Carela was tried a second

-4-

time and convicted on both counts. On January 22, 2014, Carela was sentenced to 196 months of incarceration. This timely appeal followed.

## II. Discussion

Carela raises a number of issues on appeal. Specifically, Carela argues that: (1) the district court erred when it admitted an unexecuted draft contract into evidence in violation of the Federal Rules of Evidence; (2) the district judge made several improper remarks that violated Carela's constitutional rights; (3) the district court improperly admitted testimony in Spanish in violation of the Jones Act, 48 U.S.C. § 864; (4) the Government engaged in prosecutorial misconduct; and (5) Carela's sentence was both procedurally and substantively unreasonable. We consider Carela's contentions below.

### A. The Unexecuted Draft Contract

#### 1. Background

During the course of the second trial, the Government sought to introduce an unsigned copy of a draft sales contract (the "draft contract") via which Edwin Léon-Léon ("Léon") sold Carela the red Ford Excursion that law enforcement officers found on the beach on September 17, 2012. The Government also called Léon to testify that Léon and Carela had executed the draft contract. After hearing Léon's testimony, the district court

admitted the draft contract into evidence, over Carela's objections regarding the authenticity of the document, because Léon did not keep a copy of the original and Léon attested that he gave the original to Carela when the sale was executed.

Carela now argues that the draft contract was improperly admitted because it is proscribed hearsay and its admission requires a new trial.

Carela concedes that he did not object to the admission of the draft contract on hearsay grounds and that plain error review would normally apply. See United States v. Avilés-Colón, 536 F.3d 1, 22 (1st Cir. 2008). Nonetheless, Carela argues that because he objected to the admissibility of the draft contract on the ground that it could not be authenticated, we should apply closer scrutiny. United States v. Jefferson, 925 F.2d 1242, 1254 (10th Cir. 1991) (stating that closer scrutiny may be appropriate when the failure to preserve the precise grounds for error is mitigated by an objection on related grounds).

**2. Applicable Law and Analysis**

As noted above, we generally employ plain error review when a party has failed to preserve an objection in the lower court. United States v. Acevedo-Maldonado, 696 F.3d 150, 156 (1st Cir. 2012) (citing United States v. Rodríguez, 525 F.3d 85, 95 (1st Cir. 2008) (plain error review applies where defendant failed

-6-

to object on hearsay grounds)).  Carela argues that we should apply closer scrutiny, but fails to cite to any case law affirming that we are bound to do so.  Nonetheless, we note that his claims still fail under this rubric.

When reviewing for plain error, we ask whether "(1) an error occurred; (2) the error was clear and obvious; (3) the error affected the defendant's substantial rights; and (4) the error impaired the fairness, integrity, or public reputation of the judicial proceedings."  United States v. Ramos, 763 F.3d 45, 56 n.15 (1st Cir. 2014) (citation omitted).

Here, the prosecution sought to introduce the contract as additional evidence that linked Carela to the drug smuggling operation.  The Government's case did not depend on the introduction of the draft contract into evidence because there was already ample evidence against Carela, which included: (1) Carela met law enforcement officers while hitchhiking in an area that is known to be a drug delivery point; (2) Carela was found within two miles of where the shipment of cocaine had been found several hours earlier while wearing jet skiing shoes in a disheveled and dehydrated state; (3) the Yabucoa officers who are from the area did not immediately recognize Carela; (4) Carela provided police with an unlikely story that he was in the area collecting metal even though the area is not known for metal collection; (5) Carela

admitted to the police that he had been on a boat and that he had accepted an offer of $5,000 to unload cocaine; and (6) Carela was wet when he was patted down.  As a result, whether Carela did in fact purchase the Ford Excursion is not essential to link him to the drug conspiracy.  Because there was an overwhelming amount of other evidence against Carela, we are unable to conclude that the admission of the draft contract somehow violated Carela's substantive rights.

In light of the ample evidence against Carela, the district court's admission of the draft contract did not impact Carela's substantial rights.  Our conclusion would be the same under the closer scrutiny approach.  Thus, we find that it was not plain error for the district court to admit the draft contract into evidence.

**B. Whether the District Court Judge Erred by Commenting on the Evidence**

**1. Background**

During the course of the second trial, the district court judge stated in open court that he would allow the draft contract to be presented as evidence because (1) the draft contract had been authenticated; (2) the draft contract was admissible because the original copy of the contract was lost or destroyed; and (3) the original contract could not be subpoenaed from the purchaser.

In a subsequent sidebar conference, the district court judge again stated that he would admit the draft contract because Léon did not keep a copy of the original and the original copy of the draft was not available.

Carela argues that the district court's ruling violated his Fifth and Sixth Amendment rights because it improperly endorsed the Government's position. This ruling, Carela argues, deprived the jury of its corresponding factual determination because it prevented the jury from deciding whether the original sales contract ever existed, whether Léon kept a copy of the original contract, and whether Léon gave a credible explanation as to why the original contract was missing. Carela avers that the district court's ruling constituted error and requests a new trial.

**2. Applicable Law and Analysis**

Carela did not contemporaneously object to the comments at issue during the proceedings below. As a result, we review the district judge's comments under the plain error standard.

A trial judge "retains the common law power to question witnesses and to analyze, dissect, explain, summarize and comment on the facts and evidence." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (citations omitted). However, the judge may not overstep his bounds and give an impression of judicial bias. United States v. Rivera-Rodríguez, 761 F.3d 105, 111 (1st Cir.

2014).  Improper judicial intervention will seriously prejudice a defendant's case if there is a reasonable probability that, but for the error, the verdict would have been different.  Id. at 112. In order to determine if there was judicial bias, we consider each intervention in the context of the trial as a whole, whether the comments were improper, and whether the complaining party can show serious prejudice.  Id. at 111.

Federal Rule of Evidence 1008 establishes that the jury generally determines whether a writing produced at trial is the original writing.  Fed. R. Evid. 1008.  In the same vein, we have held that the Sixth Amendment guarantees a criminal defendant the opportunity for a jury to decide guilt or innocence.  United States v. Bello, 194 F.3d 18, 25 (1st Cir. 1999).

Here, we do not find that the district court judge acted improperly or that he decided Carela's guilt or innocence.  The statements that Carela objects to are part of the district court's ruling regarding the admissibility of the draft contract.  In light of the trial as a whole, we cannot conclude that the district court's ruling to admit the draft agreement in open court somehow prejudiced Carela.  As stated in the preceding section, there was significant evidence in this case against Carela.  Thus, we cannot conclude that but for the district court's ruling the result of the proceeding would have been different.

We further note that our review of the transcripts to which Carela refers yields no commentary or question by the trial judge that exceeds the bounds of acceptable judicial participation.  See Acevedo-García v. Monroig, 351 F.3d 547, 561 (1st Cir. 2003).

As such, we find that the district court's comments were proper and did not endorse the Government's position.

## C. Whether the Jones Act was violated

### 1. Background

Carela claims that the Jones Act[3] was violated because on the second day of trial, Agent Martínez testified to the Spanish version of Carela's statement.  In simpler terms, Agent Martínez testified that Carela told him that he had been driving "*a red-type guagua, tipo guagua*."  Carela posits that there is no English meaning of the word "guagua" or "tipo" and that this statement violated the Jones Act and necessitates a new trial.

Carela further takes issue with what he characterizes as the prosecutor's attempt to get around the Jones Act by attempting to translate "guagua" as a red truck during the Government's

---

[3]  The Jones Act requires that all pleadings and proceedings in the United States District Court for the District of Puerto Rico be conducted in the English language.  48 U.S.C. § 864; see also United States v. Millán-Isaac, 749 F.3d 57, 63 (1st Cir. 2014).

-11-

closing.[4] Carela vociferously argues that this is an inaccurate translation of the word "guagua," which according to Carela can only mean bus.

### 2. Applicable Law and Analysis

Carela readily concedes that no Jones Act objections were raised below.  As a result, we review for plain error.  See United States v. Mescual-Cruz, 387 F.3d 1, 12 (1st Cir. 2004).

In general terms, a prosecutor's comment does not violate the Jones Act so long as the proceedings were conducted in English.  United States v. Báez-Martínez, 786 F.3d 121, 127 n.1 (1st Cir. 2015) (clarifying that an occasional reference to a foreign language word or phrase by a lawyer or witness does not offend the Jones Act).

Further, a violation of the English language requirement constitutes reversible error whenever the appellant can demonstrate that the untranslated evidence "has the potential to affect the disposition of an issue raised on appeal."  United States v. Rivera-Rosario, 300 F.3d 1, 10 (1st Cir. 2002).  However, there is no prejudice from a Jones Act violation if the untranslated evidence lacks such potential.  Id.

---

[4]  The prosecutor stated during his closing "[h]e tells us that he was in a red guagua, in a red truck, to go to the area to provide his services."

-12-

We cannot find that there was a Jones Act violation in this case. There is no dispute that testimony in question was delivered in English. It is true that the English testimony was peppered with Spanish colloquialisms. However, an occasional reference to a Spanish word or words does not offend the Jones Act.

Carela did not suffer any prejudice here. The disputed statement lacks the potential to impact the disposition of the issue raised on appeal. As has already been discussed in this opinion, the record shows that there was ample evidence linking Carela to the charged conduct. The passing references to "guagua" and "tipo" lack any potential to change the outcome of this case. Although the prosecutor may have attempted to translate "guagua" during his closing remarks, the reference also lacked any potential to prejudice Carela or to affect the disposition of the case.

In light of the foregoing, we conclude that there was no violation of the Jones Act. We further conclude that Carela suffered no prejudice.

## D. Alleged Prosecutorial Misconduct

### 1. Background

Carela maintains that the prosecutor's closing and rebuttal arguments constituted prosecutorial misconduct and merit

reversal.[5] Carela argues that the prosecutor improperly: (1) told the jury that the red Ford Excursion was registered in Carela's name when in fact it was not; (2) misrepresented the legal significance of the draft contract by calling it a contract instead of a draft contract and claiming that it certified the details of the sale; and (3) implied that Carela was charged with a conspiracy to possess with intent to distribute more than five kilograms of cocaine, and substantive possession in an uncharged conspiracy.

According to Carela, the context of the prosecutor's intentional misconduct must favor reversal because: (1) the allegedly improper statements were made during closing and rebuttal arguments after the court instructed the jury -- a "delicate point in the trial process," United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995); (2) the misconduct occurred after the jury in the first trial had failed to convict him; and (3) the United States Attorney's Office in the District of Puerto Rico, where the case was tried, allegedly has a long-standing problem of prosecutorial misconduct during closing arguments.

---

[5] Carela argues that his Jones Act violations claims also qualify as forms of prosecutorial misconduct. However, as we have already stated in our preceding section, there was no Jones Act violation in this case.

## 2. Applicable Law and Analysis

Because Carela did not raise these objections during trial, this Court reviews the prosecutor's comments under the plain error standard.  United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009).  In the context of prosecutorial misconduct, this Court reverses a district court "only if the prosecutor's remarks 'so poisoned the well that the trial's outcome was likely affected.'"  United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015) (quoting United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011)).  When determining whether there was prosecutorial misconduct, we consider the following factors: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[]."  Id. (citation and internal quotation marks omitted) (alteration in original).  We further note that when assaying the prosecutor's remarks, context often determines meaning.  United States v. Sepúlveda, 15 F.3d 1161, 1187 (1st Cir. 1993).  In borderline cases, the standard of review can also figure importantly.  Id. "[I]n the absence of a contemporaneous objection it seems fair to

give the arguer the benefit of every plausible interpretation of her words." Id. (citations omitted).

The Government concedes that the Ford Excursion was not registered to Carela. However, the Government argues that no error resulted from a twice made comment during a long closing. We note that an unintentional misrepresentation of the record may constitute misconduct under certain circumstances. United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007).

Although the prosecutor's statements at issue were inaccurate, they did not so poison the well that "the trial's outcome was likely affected." Vázquez-Larrauri, 778 F.3d at 283 (citation omitted) (internal quotation marks omitted). In particular, two factors render the prosecutor's comments harmless: (1) "the district judge gave curative instructions" as to the jury's role in weighing the evidence and determining guilt, including effective direct reference to the evidentiary value to be given to lawyers' closing arguments; and, most importantly and as alluded to above, (2) "the strength of evidence against [Carela]" (i.e. his admissions and the circumstantial evidence) outweighs any risk of affecting Carela's substantial rights. Id.

Carela also takes issue with the prosecutor's statement that the draft contract certified that the Ford Excursion was being sold and that the draft agreement was "a very specific contract."

-16-

The Government again concedes that the prosecutor's word choice was far from ideal, but posits that these statements did not affect the outcome of trial. We also agree with the Government on this point. Although we encourage the Government to refrain from utilizing this type of language during trial and to ensure that its statements are factually accurate, we cannot conclude that Carela suffered prejudice here. As we have discussed throughout this opinion, there was an abundance of evidence against Carela in this case. In fact, Carela himself admitted to being part of the conspiracy. As such, we cannot conclude that the prosecutor's gaffes poisoned the well and impacted the outcome of trial.

Carela further claims that the prosecutor improperly implied that Carela was guilty of an uncharged conspiracy because he purchased the Ford Excursion.

> [Carela] needed a van. He bought it before in July with other co-conspirators. As Mr. Edwin Léon Léon explained to you, the transaction was somebody came in and paid him cash for the vehicle. When he was selling it, two vehicles arrived, five or six individuals. He thought he was selling to this individual, but then as they were ready to sign the documents, he said, "No, no, no. Please put it in the friend of my relative or friend, Mr. Víctor Manuel Carela." And he has the documents to purchase it.
>
> **That's** a conspiracy. More than two individuals working together to accomplish what the object of the conspiracy is in this case. (Emphasis added)

-17-

Although the use of the word "that" is somewhat ambiguous, we read the prosecutor's statement as referring to the charged conspiracy to smuggle cocaine and not a conspiracy to purchase the Ford Excursion. Moreover, we emphasize that in the absence of a contemporaneous objection, it seems fair to give the Government the benefit of every plausible interpretation of the words in dispute. Sepúlveda, 15 F.3d at 1187.

In light of the evidence against Carela, we conclude that Carela failed to show that the prosecutor's statements resulted in plain error.

**E. Whether the Sentence was Unreasonable**

**1. Background**

Lastly, Carela argues that his sentence was both procedurally and substantively unreasonable. Carela attacks his sentence on the ground that the court improperly considered evidence in Spanish in violation of the Jones Act. In simpler terms, the district court refused Carela's requested minor role adjustment because it relied on evidence that Carela admitted to driving a red "guagua." According to Carela, because there is no English language evidence that supports a finding that Carela drove the red Ford Excursion, his sentence is unreasonable.

Carela points out the following factors to support his contention that he only played a minor role (i.e. did not occupy

-18-

a position of trust): (1) "he was not trusted with the executed contract or any other documents related to ownership" of the red Ford Excursion; (2) he was not given the keys to the red Ford Excursion; (3) he did not pay for the red Ford Excursion; (4) he did not drive away in the red Ford Excursion at the time of sale; (5) he was not paid in advance, or for that matter was never paid, the $5,000 he was to receive for his services; and, finally, (6) his role is notably minor if the broad context of the drug smuggling conspiracy -- an international operation requiring complex logistics management (i.e., coordination of travel from Venezuela to Puerto Rico) and substantial investment of funds in the product (i.e., cocaine), labor, and equipment (e.g., transport Vessel) -- is taken into consideration. He thus avers that it was clear error to deny his requested minor role adjustment.

### 2. Applicable Law and Analysis

This Court reviews sentencing decisions for reasonableness based on a totality of the circumstances, and in a bifurcated manner: first, for procedural reasonableness, and second, for substantive reasonableness. United States v. Ayala-Vázquez, 751 F.3d 1, 29 (1st Cir. 2014). The district court's "legal determinations of the Sentencing Guidelines' meaning and scope" are reviewed de novo, and its factual determinations are reviewed for clear error. United States v. Bryant, 571 F.3d 147,

153 (1st Cir. 2009).  This Court will not "upset the sentencing court's fact-based application of the guidelines unless it is clearly erroneous."  United States v. Santos-Batista, 239 F.3d 16, 21 (1st Cir. 2001) (citation omitted).

In order for a criminal defendant to qualify for a minor role reduction under United States Sentencing Guidelines § 3B1.2(b), he must satisfy a two-pronged test: (1) "he must demonstrate that he is less culpable than most of those involved in the offenses of conviction;" and, (2) "he must establish that he is less culpable than most of those who have perpetrated similar crimes."  United States v. Mateo-Espejo, 426 F.3d 508, 512 (1st Cir. 2005) (citations omitted). Typically, "[r]ole-in-the-offense determinations [e.g., minor-role adjustments] are notoriously fact-sensitive."  United States v. Ortiz-Santiago, 211 F.3d 146, 148 (1st Cir. 2000).  We have held that in making these determinations a "defendant who participates in only one phase of a conspiracy may nonetheless be found to play a non-minor role in the conspiracy as a whole."  United States v. Vargas, 560 F.3d 45, 51 (1st Cir. 2009).  Finally, it must be noted that "[r]eliable hearsay is . . . admissible during sentencing proceedings."  United States v. Ramírez-Negrón, 751 F.3d 42, 52 (1st Cir. 2014).

Here, we have already found that there is no Jones Act violation.  Further, the district court did not commit a Jones Act

-20-

violation when it stated that Carela "drove the Ford Excursion." The district court's statement did not prejudice Carela such that reversal is required here. In fact, the district court refused Carela's proposed minor role adjustment on the grounds that Carela (1) used his name to purchase the red Ford Excursion that was used to bring 15 cans of gasoline to the landing site in order to refuel the transport vessel; (2) the red Ford Excursion was going to be used to transport 38 bales of cocaine found at the vessel landing site; (3) Carela was paid $5,000; and (4) when Carela used his name to purchase the red Ford Excursion there were other individuals with him and it was one of these other individuals who paid for the Ford Excursion.

Carela's involvement in the charged offenses was not dependent on his driving of the Ford Excursion. Thus, even if the brief reference to Carela driving the Ford Excursion could have constituted a Jones Act violation, it would not have prejudiced Carela.

Further, denying the minor role adjustment to Carela did not constitute clear error. Carela admitted to loading the cocaine onto a vehicle and transporting the cocaine. Carela also admitted that he had been hired to refuel the vessel that was transporting narcotics.

Carela failed to establish that he was less culpable than the other participants in the offense, or indeed that he was less culpable than similarly situated offenders.  A lack of profit or success in the criminal enterprise does not trigger a downward adjustment for a minor role.  Cf. United States v. García-Ortiz, 657 F.3d 25, 29 (1st Cir. 2011) ("The essential predicate is a showing that the defendant is both less culpable than his confederates . . . and less culpable than the mine-run of those who have committed similar crimes." (citing United States v. Ocasio, 914 F.2d 330, 333 (1st Cir. 1990))).  The record makes clear that the trial court fully considered the relevant factors in denying the minor role adjustment.

We further note that the district court varied downward when sentencing Carela from a suggested 235 to 293 months to a term of 196 months because the court felt that the guideline range was too harsh.

### III.  Conclusion

Having found no reversible error in the proceedings of the trial court, Carela's sentence and conviction are affirmed.

**Affirmed.**